THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAESAL REDMOND, Defendant-Appellant.

First District (1st Division)   No. 1—01—0405

Opinion filed June 30, 2003.

Rita A. Fry, Public Defender, of Chicago (Todd A. Shanker, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Saesal Redmond, was found guilty of first degree murder and sentenced to 22 years' imprisonment. On appeal, defendant presented several issues for review. Those issues have been condensed into five main issues: (1) whether the trial court erred in finding that he voluntarily consented to leave his apartment and accompany the police; (2) whether officers had probable cause to arrest after discovering a handgun in his bedroom; (3) whether his written statement was voluntarily given after spending 52 hours in custody and being interrogated 14 times after his arrest; (4) whether the State proved beyond a reasonable doubt that he was accountable for murder; and (5) whether his trial counsel was ineffective, where trial counsel failed to call certain witnesses who allegedly would have corroborated his testimony and alibi.

## BACKGROUND

Bryant Clark was fatally shot on January 28, 1998. Detective Steve Buglio was assigned to investigate the fatal shooting. Defendant was arrested on March 12, 1998. The arrest report indicates that defendant was arrested after being implicated in the fatal shooting death of Bryant Clark and found in possession of a .40-caliber handgun. Defendant and codefendant Clint Woods, who is not a party to this appeal, were charged with first degree murder.

## I. MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE

On defendant's motion to quash arrest and suppress physical

evidence, defendant testified that on March 11, 1998, shortly before midnight, while he was in bed, police officers came to his sister's apartment where he was staying. He testified that when the officers entered the bedroom, "They had guns. They had their guns out. When I came to the door they had their guns out." He testified that he was handcuffed in the kitchen and then taken outside. He was not presented with a search warrant or a warrant for his arrest and did not give permission to search the apartment. Defendant testified that the police did not tell him why they where there. While he was sitting in the police vehicle with Detectives Riley and Doroba, neither officer mentioned anything about what happened at 69th Street and Paulina Street. He did not give the officers permission to search his car, but they took his car keys from his pocket.

Defendant's sister, Arriane Redmond, testified that at about 11:55 p.m. on March 11, 1998, she heard a loud knocking at her apartment door. The officers identified themselves and Arriane opened the door. The officers asked her if defendant was there and she said, "Yes." As she turned to check defendant's bedroom, "two of the officers came through the kitchen area and they like actually beat me to the back room door." Arriane stated that she did not give the officers permission to enter her apartment. After defendant was allowed to put on some jeans and a jacket, he was handcuffed at the corner of the kitchen door. Approximately an hour after their arrival, Arriane was asked to sign a white piece of paper. She signed the paper because she thought the detective was comparing her signature to that on the lease. On cross-examination, Arriane testified that when the officer had her sign the paper, the only portion visible was the signature line and she did not see anything indicating that the paper she was signing was a consent to search. She saw an officer recover a gun from the box spring of defendant's bed.

Detective Buglio testified that he spoke with defendant's cousin, Clint Woods, on March 10, 1998, in relation to the January 28, 1998, fatal shooting of Bryant Clark (also known as "Little Wolf"). On that date, Woods denied any knowledge of the shooting. During a second meeting with Woods on March 11, 1998, Woods named defendant as the shooter and stated that defendant used a .40-caliber semiautomatic handgun. Detective Buglio testified that two .40-caliber bullet casings were recovered from the murder scene. Woods told Buglio that defendant either keeps the gun in his car, probably under the driver's side rear seat or behind a vent, or in the bedroom where he sleeps. Woods told Detective Buglio that shortly before the shooting, he observed Clark and defendant in the Red Shoe lounge. Woods later observed Clark get into defendant's vehicle. Earlier that evening,

defendant told Woods that he was going to "rob Little Wolf." Woods told defendant to "be careful, because Brian [sic] Clark, the victim, is known to carry a weapon at times." Woods told the detective that he saw defendant return to the lounge sometime after 10:30 p.m. The victim was not with defendant, and during a brief conversation with defendant, defendant told Woods that " 'It's been one for Shorty.' " Woods related that that meant "Little Wolf was dead." Woods told Detective Buglio that after that, defendant seemed to be spending more money than he usually did.

Detective Buglio further testified that a .40-caliber semiautomatic handgun was recovered from defendant's bedroom, "stuffed in the top of a boxspring where you could only view it from underneath the boxspring. It was stuck between the boxspring and the top padding." After locating the gun, he placed defendant under arrest and handcuffed him. Buglio testified that prior to that moment, defendant was not under arrest. Approximately 30 minutes passed between the time the detectives arrived and defendant's arrest. On cross-examination, Detective Buglio stated that he read the reports of two other officers that interviewed Woods on March 11, and the report indicated that Woods sold Wolf 4½ ounces of cocaine. After the drug sale, Woods said that he did not see Wolf the rest of the night. Woods told Buglio that defendant and the victim were at the lounge separately.

Detective James Riley testified that he did not recall whether Detective Buglio had his hand on defendant's arm as they exited the apartment and came downstairs. Riley stated that defendant was not handcuffed at that time. He recalled that approximately 15 minutes passed between the time defendant was placed in a police car and the time the gun was recovered. Riley was asked whether defendant was free to leave once defendant was placed in his police car and Riley responded, "No, not really."

In August 1999, the court denied defendant's motion to quash arrest and suppress the evidence. The court reasoned that the police were given "strong enough information" that they should investigate defendant after speaking with Clint Woods. The court believed that taking defendant and placing him in the squad car was not a violation and defendant was not under arrest at that time. Based on Arriane's age and background, the court also did not believe her testimony that she did not know what she signed when she signed and dated the consent to search form at her apartment. Further, because the police had written consent to search, the police discovered the gun on the premises and "had full corroboration of someone, even if he's just the finger-pointer and is not implicating himself." In denying defendant's

motion to quash arrest and suppress evidence, the court held that placing defendant in the unmarked squad car did not constitute an arrest; Arriane Redmond's testimony was not credible; and the court noted that the police had a written consent and a tip that was corroborated when the gun was found.

## II. MOTION TO SUPPRESS STATEMENTS

Pursuant to his motion to suppress statements, defendant testified that he was kept at the police station approximately 52 hours and left the room about seven or eight times, was allowed to used the bathroom about five times, and was taken downtown once to take a polygraph test. While at the station, defendant asked to use the phone but the officers told him to wait. Eventually, he was allowed to call home for approximately two minutes. Defendant testified that he asked Detective Buglio and a couple of other detectives that kept coming in and questioning him to speak with a lawyer. During the 52-hour period, he was given a bag of potato chips and a can of pop, and when he told the detectives that he did not know anything about the murder, Detective Buglio took the food away from him. During the 52-hour period, defendant slept in segments of 15 to 30 minutes, for a total of 4 hours.

Assistant State's Attorney Villasenor spoke with defendant on five separate occasions between March 12 and March 14, 1998. Villasenor testified that he gave defendant his *Miranda* rights from memory before he interviewed him at the police station. During the initial 30-minute interview, defendant provided a statement. Villasenor began an interview with defendant at 2:30 a.m. and started the handwritten statement at about 4 a.m. The statement was signed at approximately 4:05 a.m. on March 14, 1998. Defendant was present during the entire time that the statement was handwritten. On March 13, defendant did not tell Villasenor that he wanted to speak with a lawyer or did not want to give a statement.

Detective Buglio denied telling defendant that they would help him if he signed the handwritten statement, threatening to arrest defendant's girlfriend or making any threats to defendant. Buglio stated that in his investigation, he spoke with two witnesses who were not together at the shooting, Marilyn Hardy and Jacqueline Husband. Buglio further stated during the State's rebuttal that he did not threaten defendant during the preparation of his handwritten statement and did not take any food away from him.

Assistant State's Attorney Ignatius Villasenor testified in rebuttal that the information in defendant's written statement came from the defendant and he was given an opportunity to change or review anything in that statement. Villasenor stated that neither he nor

anyone else in his presence threatened to "lock up" defendant's girlfriend and defendant told him that he had been treated well by the police.

In March 2000, the trial court denied defendant's motion to suppress his written statement. In its ruling, the court noted that in the several days of testimony, several witnesses testified that defendant was advised of his *Miranda* rights, though defendant asserted that he was not advised. Relative to the 52 hours in custody, the court noted that there are two defendants involved in this case, there was a polygraph exam and witnesses to be interviewed during that time. The court reasoned that 52 hours in custody could be "more than enough time to be in custody," when taking the "sleeping patterns" into account. However, that was only one factor going toward the statement and not enough to suppress it. Further, there was conflicting testimony as to the food provided to defendant, but the court did not "believe that had reached a point where the statement could be suppressed."

## III. BENCH TRIAL

Defendant's statement, which was read into evidence by Assistant State's Attorney Villasenor at trial, provided that Woods asked defendant to participate in a "lick," which " 'means a robbery of some money or jewelry from some person.' " Woods asked defendant to serve as " 'security' " while Woods and Wolf committed the " 'lick.' " Defendant "has known Wolf for about six months, and he met Wolf through Clint Woods." Defendant asked where the "lick" was going to happen and who they were going to rob. Defendant stated that Woods answered that the "lick" " 'was in the area,' " which defendant " 'understood to mean in the neighborhood, and that [defendant] would not know the person.' " Woods stated that he and Wolf would go in the house and come back to the car. Defendant, Woods and Wolf " 'sat around for about 30 to 45 minutes planning the robbery.' " Defendant was promised $2,000 should Woods and the victim find $20,000 inside. Woods expected that much money to be present because the man at the house was a drug dealer. After Woods made a phone call, Woods, defendant and the victim left the bar together. They used defendant's car because it was dark and nobody knew that car. Woods asked for the keys to the car and told Wolf to sit in the front passenger seat and told defendant to sit in the backseat. The three drove from the bar. While driving, Woods told defendant to stay in the car while Woods and Wolf " 'did the rest.' " Woods pulled into an alley on Paulina Street, turned the car around and parked facing northbound in front of a garage at about 6911 South Paulina Street.

Defendant's statement further provides that Woods and Wolf

exited the vehicle and went into an alley together. After about two to three minutes, Woods and Wolf walked out of the alley, stood on the sidewalk and Woods returned to the car. Defendant was now sitting in the driver's seat. Woods told defendant to wait there and walked back onto the sidewalk where Wolf stood. Woods approached Wolf from behind. Defendant then observed Woods pull out a .40-caliber handgun from his waist and point it at Wolf's head and fire two times. Wolf fell to the ground. Defendant saw Woods bend down over Wolf and take money from Wolf's front pockets. Woods put the money in his own pockets, entered the car and told defendant "let's go."

As he drove back toward the lounge, defendant asked Woods why he shot Wolf, because he thought the "lick was supposed to be a house not a person, as [Woods] said before." Woods responded that Wolf was the "lick" because Wolf owed him $4,000. While in the bar's parking lot, Woods offered some of the money taken off of Woods' person, but defendant declined because "that wasn't the plan." Woods and defendant stayed inside the bar for about 15 minutes. In the parking lot, defendant saw Woods pull out the same .40-caliber gun and asked defendant to hide it for him. Defendant took the gun home that night and hid it inside the box spring of his mattress in his sister's apartment. Woods stated that he would get the gun later.

At the close of the State's case in chief, defendant moved for a directed finding and asked that the court "reopen the motion to quash and suppress evidence and a motion to suppress statement." The State responded in oral argument. The court held that the State "put on enough for a *prima facie* case" and defendant's motion was denied.

Arriane Redmond, Crystal Archie and the defendant testified on the defendant's behalf. Following defendant's case in chief, defendant was found guilty of murder based on accountability. Specifically, the court found defendant's written statement to be credible, defendant did not share a criminal intent with the principal, but defendant was accountable for the murder based on his participation in a common scheme.

Defendant filed a motion to reconsider the finding, asserting that he could not be held accountable for the murder because there was no evidence that he took part in the murder or was united in a common interest with the principal offender of the murder. His motion for reconsideration was denied and defendant was sentenced to 22 years' imprisonment with credit of 1,007 days.

## ANALYSIS

### I. VOLUNTARINESS OF ACCOMPANYING POLICE

■ Defendant asks whether the trial court erred in finding that he

voluntarily consented to leave his apartment and accompany the police. The State responds that defendant has waived this issue for review as he did not raise this in his motion for a new trial or his motion to reconsider the finding of guilt. It is true that in order to preserve an argument, for the purpose of appeal, the challenge must be presented to the trial court not only at the motion to suppress stage, but it must also be included in the defendant's posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).

However, the principle of waiver "limits the parties' ability to raise an argument, not this court's right to entertain an argument." *People v. Heard*, 187 Ill. 2d 36, 60, 718 N.E.2d 58 (1999). Even if the issues have been waived, a reviewing court will sometimes override waiver considerations in order to reach a just result and to maintain a sound and uniform body of precedent. *American Federation of State, County & Municipal Employees v. County of Cook*, 145 Ill. 2d 475, 480, 584 N.E.2d 116 (1991).

■ The determination of custody involves an objective analysis of the circumstances surrounding the interview as a reasonable and innocent person in the defendant's position would perceive them. *People v. DeSantis*, 319 Ill. App. 3d 795, 804, 745 N.E.2d 1 (2000). When one voluntarily accompanies police officers, he has not been arrested and has not been "seized" in the fourth amendment sense. See *People v. Neal*, 111 Ill. 2d 180, 193-94, 489 N.E.2d 845 (1985).

■ Here, the trial court reasoned that it was not a violation of defendant's rights to have him in the police car while they conducted a search of his sister's apartment. The court also held that he was not under arrest at that time. The trial court stated:

> "As to the voluntary [*sic*], the officer stated that 'We asked him to go to Area 1 about something that was involving his cousin that I didn't want to bring out in from [*sic*] of the other people in the apartment.' That, as the defense pointed out, to go voluntarily to the police department you wouldn't normally do. But where they have been giving specifics involving your cousin, certainly [it] is believable that that is what he is doing."

Though we recognize there is evidence supporting each side, we cannot say that the trial court's determination that defendant went with the police freely was against the manifest weight of the evidence. See *DeSantis*, 319 Ill. App. 3d at 804.

Defendant also contends that he was seized after being escorted out of his apartment and placed in the backseat of the squad car and notes that Officer Riley testified that he was not free to leave. We note that there was conflicting evidence as to whether defendant was handcuffed and whether he could exit the unmarked police car. In

light of the conflicting testimony, the trial court was in the best position to observe the demeanor of the witnesses while testifying, to determine which witnesses were credible. The weight afforded to the testimony by the trial court must be given deference upon review, absent a clear abuse of discretion. *Horace Mann Insurance Co. v. Brown*, 236 Ill. App. 3d 456, 465, 603 N.E.2d 760 (1992). We cannot say that the trial court's determination relative to whether he was seized prior to arrest was a clear abuse of discretion.

## II. PROBABLE CAUSE TO ARREST

■ Defendant next asserts that the officers lacked probable cause to arrest after discovering a handgun in his bedroom, because the only person alleging that the gun was used in the murder was a "lying, thrice-convicted felon and gang member with 23 arrests and a strong motive to save his own skin by placing full responsibility for the crime on Redmond." The State points out, again, that this issue was not raised in defendant's posttrial motions and is, therefore, waived. Waiver notwithstanding (see *American Federation*, 145 Ill. 2d at 480), we find that the trial court's ruling was not against the manifest weight of the evidence.

■ In determining whether probable cause existed to effectuate a warrantless arrest, a court must look to the totality of the circumstances and make a practical, commonsense decision whether there was a reasonable probability that an offense was committed and that the defendant committed it. *People v. Tisler*, 103 Ill. 2d 226, 237-38, 469 N.E.2d 147 (1984). Probable cause exists if a police officer has knowledge of facts that would lead a reasonable person to believe that a crime has been committed and that it was committed by the defendant. *People v. Neal*, 111 Ill. 2d 180, 193, 489 N.E.2d 845 (1985). Here the officers had information that defendant participated in a murder where a .40-caliber semiautomatic handgun was used. They found matching shell casings at the scene and, upon searching defendant's bedroom, found a .40-caliber semiautomatic handgun under his mattress. We hold that the officers had probable cause to arrest defendant under these circumstances. The trial court's decision was, therefore, not against the manifest weight of the evidence.

## III. VOLUNTARINESS OF STATEMENT

■ Defendant also contends that, based on the circumstances surrounding his written statement, it was not given voluntarily. Again, the State asserts that this issue has been waived for our review. In the interest of justice, we will review the matter. See *American Federation*, 145 Ill. 2d at 480.

■ When a defendant maintains that his confession was not given

voluntarily, the State bears the burden of demonstrating that defendant's confession was made voluntarily. *People v. Lash*, 252 Ill. App. 3d 239, 242, 624 N.E.2d 1129 (1993). Upon the establishment of a *prima facie* case, the burden of going forward with proof properly shifts to the accused. *People v. Patterson*, 154 Ill. 2d 414, 445, 610 N.E.2d 16 (1992).

■ The test for the voluntariness of a statement is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the accused and the length of the interrogation. *People v. Fuller*, 292 Ill. App. 3d 651, 664, 686 N.E.2d 6 (1997). To determine the voluntariness of statements, the court may consider the age, intelligence, experience, and physical condition of the defendant, the length of the interrogation, the possibility of threats, promises or physical coercion, as well as the presence of a parent or youth officer. *People v. Williams*, 275 Ill. App. 3d 249, 256, 655 N.E.2d 1071 (1995).

■ Defendant here was interviewed by Assistant State's Attorney Villasenor approximately five separate times between March 12 and March 14, 1998. Villasenor recalled that food was brought to the defendant and defendant told him that he was given soda, water, chips, hamburgers and fries to eat. Defendant stated that he was allowed to use the bathroom about five times and was outside the interview room 7 or 8 times, totaling an hour and a half. Defendant testified that he was given a bag of potato chips and a pop, but claimed it was taken from him when he told detectives that he did not know anything about a murder. Defendant also acknowledged that he was allowed to make at least one phone call, albeit, by his testimony, not allowed upon his first request. He recalled sleeping in 15- to 30-minute intervals and that officers woke him up about seven times. Defendant also testified that a detective cursed at him and grabbed him by the neck. However, defendant acknowledged to Assistant State's Attorney Villasenor, outside the presence of any police officers, that he was treated well and allowed to call his girlfriend. Defendant's written statement also affirmed that he was treated well. Defendant and Villasenor testified that defendant did not advise Villasenor that any officers abused him.

The trial court here considered all of the testimony presented at the motion to suppress hearing and noted in its ruling that 52 hours could be "more than enough time to be in custody," when taking the "sleeping patterns" into account, but that was only a factor going toward the statement, but not enough to suppress it. Further, the court noted that there was conflicting testimony as to the food provided to defendant, but the court did not "believe that had reached a point where the statement could be suppressed." Rulings by the

trial court on the question of the voluntariness of a confession will not be disturbed by a court of review unless against the manifest weight of the evidence. *Patterson*, 154 Ill. 2d at 445-46. After a thorough review of the record, we cannot say that the trial court's decision was against the manifest weight of the evidence.

Alternatively, defendant contends that even if this court finds that the statement was voluntarily given, it was still inadmissible because it was the product of an unlawful detention and attenuated from the illegal arrest. Because we uphold the trial court's ruling that the detention and arrest were lawful, defendant's attenuation arguments are moot. In our view, the evidence in defendant's suppression hearing supported a finding that defendant voluntarily agreed to accompany the police to the police station for questioning, and, thus, defendant's statement made at the police station was admissible under the circumstances described.

## IV. ACCOUNTABILITY

Defendant next contends that the State failed to prove beyond a reasonable doubt that he was accountable for Wolf's murder. Defendant asserts that the "specifically planned offense" of burglary or robbery of the unknown drug dealer was never attempted or completed. The State replies that defendant is accountable as a result of his agreement with his codefendant to commit an armed robbery, even though he claimed to be unaware of Woods' plan to murder and rob the other accomplice, not an anonymous drug dealer.

In Illinois, a person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 2000).

It is also clear under Illinois law that one can be held accountable for a different crime other than the one that was planned. See *People v. Kessler*, 57 Ill. 2d 493, 315 N.E.2d 29 (1974). Moreover, the Illinois Pattern Jury Instructions, Criminal, No. 5.03 (3d ed. 1992) (IPI Criminal 3d No. 5.03) contemplates this situation and provides:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of *an* offense, and with the intent to promote or facilitate the commission of [(*an*) (the)] offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of [(*an*) (the)] offense.
>
> [The word 'conduct' includes any criminal act done in further-ance of the planned and intended act.]" (Emphasis added.)

The accompanying committee notes provide: "Use the bracketed word 'an' and use the bracketed paragraph when the offense is different than the planned and intended offense, but done in furtherance of it" (IPI Criminal 3d No. 5.03, Committee Notes, citing *Kessler*, 57 Ill. 2d 493).

■ To prove that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence that establishes beyond a reasonable doubt that either: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266, 725 N.E.2d 1258 (2000). Evidence is sufficient when a rational trier of fact could find that the essential elements of the offense were proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). "In assessing whether the evidence against a defendant was sufficient to prove guilt beyond a reasonable doubt, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Taylor*, 186 Ill. 2d 439, 445, 712 N.E.2d 326 (1999). A conviction should not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists about the defendant's guilt. *Perez*, 189 Ill. 2d at 265.

## A. No Shared Criminal Intent

■ As previously stated, one can be held accountable for the actions of another where: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design. See *Perez*, 189 Ill. 2d at 266. In the instant case, the trial court held that defendant "did not share criminal intent with the shooter," apparently accepting that portion of defendant's statement as true. We hold that the evidence supports beyond a reasonable doubt the trial court's conclusion that defendant did not share Woods' criminal intent to murder and rob Wolf.

## B. Common Criminal Design

■ Now we must determine whether the intent requirement of the accountability statute was satisfied by defendant's participation in a common criminal design. The common design rule provides that where two or more persons engage in a common criminal design or agreement, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. *In re W.C.*, 167 Ill. 2d 307, 337, 657 N.E.2d 908 (1995). Accountability may be established through a person's knowledge of

and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself. *W.C.*, 167 Ill. 2d at 338.

After holding that defendant's written statement was credible, the court here said:

> "So, it gets down to the analysis of the accountability issue that is involved. Basically the facts coming to the statement was that there was an agreement, according to the statement, between Mr. Redmond and the codefendant, Mr. Woods. This agreement was to commit a robbery, that would have been the robbing of the victim. According to the statement, Mr. Wood[s] shoots, what I would call an execution of the victim in this case; that the Defendant in the statement agreed to participate in an armed robbery, but he had no intention to agree it was a murder. In fact they were planning a robbery. The victim was there present in the bar. The shooting did not result from the robbery because the shooter intended to both kill and rob the victim all along. And further on it also stated that Mr. Redmond states that he did not take any money that was taken from the robbery."

Defendant asserts that the "specifically planned offense" of burglary was never attempted and never transpired. He maintains that he had no intent to commit murder, just a robbery or burglary of a drug dealer. Defendant relies on *People v. Morrow*, 303 Ill. App. 3d 671, 683, 708 N.E.2d 430 (1999), and *People v. Sakalas*, 85 Ill. App. 3d 59, 405 N.E.2d 1121 (1980), to support his claim that any conduct by him that may have facilitated the offense that transpired was not performed with the intent that murder be committed.

In *Morrow*, although defendant-prostitute was engaging in an act of prostitution at the time the victim's wallet was stolen, the evidence did not show that she knowingly or voluntarily participated in the theft of the wallet or in the subsequent act of murder committed by her pimp. *Morrow*, 303 Ill. App. 3d at 679. The *Morrow* court held that absent some evidence of other circumstances or conduct from which it can be inferred that a person approved of the offense and aided it by his presence, mere presence is not enough to show that the person is an accomplice to a crime. *Morrow*, 303 Ill. App. 3d at 678-79, citing *People v. Henderson*, 142 Ill. 2d 258, 316, 568 N.E.2d 1234 (1990).

In *Sakalas*, two men entered a bus and began striking the driver on the head and arm with pipes. Sakalas said to his codefendant, "Man let's go" and grabbed the driver's badge from his shirtsleeve on the way out. *Sakalas*, 85 Ill. App. 3d at 68. Because it was unclear whether the codefendant was still on the bus when Sakalas ripped the

badge off of the arm of the victim after they both assaulted him, or whether the codefendant assisted or attempted to assist in the taking of the badge, this court held that the evidence did not establish beyond a reasonable doubt that the codefendant had a concurrent, specific intent to promote or facilitate the commission of the armed robbery. *Sakalas*, 85 Ill. App. 3d at 68. In the instant case, the State posits that according to defendant's own statement, he agreed to participate in an armed robbery planned by Woods, knew that Woods had a gun and understood that they would be engaging in a robbery of some money or jewelry from "some person." The State maintains that "[d]efendant agreed to act as security for an armed robbery of a person chosen by Woods and now wants to complain because the person chosen by Woods happened to be Wolf." It further asserts that we should consider defendant's conduct following the shooting: namely, allowing Woods to reenter the vehicle and hiding the gun for him.

█ We acknowledge that "[n]ot even presence at the scene, coupled with flight or knowledge that a crime is being committed, is sufficient, *without more*, for accountability purposes." (Emphasis added.) *People v. Dennis*, 181 Ill. 2d 87, 108, 692 N.E.2d 325 (1998). However, proof that the defendant was present during the perpetration of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. *Perez*, 189 Ill. 2d at 267; *People v. O'Reilly*, 250 Ill. App. 3d 622, 626, 621 N.E.2d 194 (1993). We also note that defendant's role as "security" was the same whether Wolf or the unknown drug dealer was targeted. Defendant's participation in the committed offense was identical to the participation that he agreed upon for the crime of burglary or robbery.

The trial court here stated in its ruling: "I believe in this case we are looking at something that is more than a mere presence; that there was an agreement for the armed robbery." The court continued:

> "Although I don't believe there was an agreement to go toward the murder, this was a—was a reasonable belief this could be a possibility, since the gun was involved. And the mere fact that proceeds are not taken from the robbery is not sufficient to provide the position, because there is no indication there was an effort to stop the crime or report it."

In reaching its ruling, the trial court relied on *People v. Perez*, 189 Ill. 2d 254, 725 N.E.2d 1258 (2000), *People v. Kessler*, 57 Ill. 2d 493, 498-99, 315 N.E.2d 29 (1974), *People v. Terry*, 99 Ill. 2d 508, 512, 460 N.E.2d 746 (1984), and *People v. Batchelor*, 171 Ill. 2d 367, 665 N.E.2d 777 (1996).

In *Perez*, the defendant was convicted of first degree murder based on accountability. In that case, the defendant did not know the shooter, did not know of the ongoing dispute and prior altercations between the shooter and the victim and did not know that anyone at the scene had a gun. The Illinois Supreme Court reversed defendant's first degree murder conviction after holding that he did not share the criminal intent of the principal. *Perez*, 189 Ill. 2d at 267. The court reasoned that, while the defendant was present at the scene, knew of its commission and fled the scene, the evidence was not sufficient to prove that he intentionally aided in or encouraged the crime's commission. *Perez*, 189 Ill. 2d at 268.

In *Kessler*, the defendant waited in an automobile outside a tavern while his two companions entered into a building to commit burglary. While inside, one of the burglars shot and wounded the tavern owner and one of them fired a shot at a police officer. Defendant was found guilty of burglary and attempted murder. The supreme court held that the record showed a common design to commit a robbery or burglary. *Kessler*, 57 Ill. 2d at 498. In that case, the defendant "sat in on the plan" with two other individuals and led those individuals to the tavern. *Kessler*, 57 Ill. 2d at 498. The burglary was the offense that the three men had jointly planned and were jointly committing, which resulted in attempted murder. *Kessler*, 57 Ill. 2d at 499. Therefore, the court held that each was legally accountable for the conduct of the other in connection therewith. *Kessler*, 57 Ill. 2d at 499.

In *Terry*, the defendant was found guilty of murder and armed violence, based on accountability. The evidence showed that the "substantive offense which the group conspired to commit was battery." *Terry*, 99 Ill. 2d at 515. The court reasoned that "each person therefore was responsible for the conduct of the other which was done in furtherance of the intended battery." *Terry*, 99 Ill. 2d at 515. The result of their acts was murder, and under the common design rule, all are legally accountable for that murder. *Terry*, 99 Ill. 2d at 515.

In *Batchelor*, another case relied upon by the trial court, the evidence showed that the defendant was in the principal offender's presence during the robbery and stabbing of a 69-year-old woman and had knowledge of the robber's criminal purpose of robbery "from the beginning." *Batchelor*, 171 Ill. 2d at 377. The court noted that the defendant assisted in the commission of the offense by acting as a lookout and sounding an alarm that the police were in the area, despite seeing the victim struggle with the principal and hearing the victim's pleas for help. Defendant fled the scene, did not report the incident, and met with the principal offender after the offenses were committed and received part of the cash taken from the victim's purse. The court

observed that the trial court expressly rejected part of defendant's court-reported statement, which it is permitted to do. Defendant's conviction was affirmed, reasoning that a common criminal purpose existed before and during the commission of the offenses. *Batchelor*, 171 Ill. 2d at 377.

■ In the case at bar, a burglary or robbery was the offense that the three men jointly planned, defendant spent 30 to 45 minutes planning the crime, defendant's car was used "because it was dark and nobody knew that car," defendant accompanied Woods and Wolf to a secondary location in furtherance of the plan, defendant took his place in the car as "security" once Woods and Wolf exited the car and after the shooting, he hid the murder weapon. Accordingly, defendant is responsible for the conduct of any one of his cohorts that is done in furtherance of the intended robbery or burglary. The result of Woods' actions was murder, and under the common design rule, defendant is legally accountable for that murder.

"Once an underlying common design to commit a planned offense is established, no additional common designs need be established for all of the individual acts committed during the commission of the planned offense." (Emphasis omitted.) *People v. McClain*, 269 Ill. App. 3d 500, 505, 645 N.E.2d 585 (1995). In order to convict a defendant under accountability, the State must show that the defendant, either before or during the commission of the offense, intentionally aided or abetted an offender in conduct that constitutes an element of an offense. *Taylor*, 186 Ill. 2d at 447, citing *People v. Dennis*, 181 Ill. 2d 87, 101, 692 N.E.2d 325 (1998). A conviction should not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists about the defendant's guilt. *Perez*, 189 Ill. 2d at 266. In our view, defendant here was properly held accountable for Wolf's murder based upon his conduct before the robbery and after the murder, and we cannot say that the defendant's statement and other evidence are so unsatisfactory that a reasonable doubt exists as to defendant's guilt.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next contends that his trial counsel was ineffective, where trial counsel failed to call certain witnesses who would have allegedly corroborated his testimony and alibi. Defendant asserts that there is a strong probability that the outcome of this case would have been different had his trial counsel called Jacqueline Husband and Marilyn Hardy. The State maintains that defendant received effective assistance of counsel where there was no evidence in the record to support the notion that there were "disinterested" witnesses who

could offer exculpatory testimony on defendant's behalf. In distinguishing the cases relied upon by defendant, the State argues that the court does know what these witnesses would have said, and therefore, defendant cannot overcome the presumption that defense counsel's decision was based on trial strategy.

■ Under the standards enunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a claim of ineffective assistance of counsel will be sustained if counsel has failed to perform in a reasonably effective manner and there is a reasonable probability that, but for this substandard performance, the outcome of the proceeding would have been different (adopted by Illinois in *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984)).

■ To show a deficiency, a defendant must overcome the strong presumption that counsel's action or inaction was the product of sound trial strategy. *People v. Richardson*, 189 Ill. 2d 401, 411, 727 N.E.2d 362 (2000). To show prejudice, a defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Richardson*, 189 Ill. 2d at 411. Both prongs of the test, deficiency and prejudice, must be shown to establish the ineffective assistance of counsel, and the failure to establish either of these will be fatal to a defendant's claim. *Richardson*, 189 Ill. 2d at 411.

■ Although an attorney's decision regarding whether or not to present a particular witness is generally a matter of trial strategy, counsel may be deemed ineffective for failure to present exculpatory evidence of which he or she is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense. *People v. Tate*, 305 Ill. App. 3d 607, 612, 712 N.E.2d 826 (1999) (defendant's postconviction petition included affidavits of three alibi witnesses); see *People v. Skinner*, 220 Ill. App. 3d 479, 485, 581 N.E.2d 252 (1991) (affidavits of defendant's mother and stepfather corroborated defendant's testimony).

In the instant case, defendant merely speculates as to the contents of the potential witnesses' testimony. He does not have any affidavits or other evidence that would support a claim of ineffective assistance of counsel for failure to call witnesses whose testimony would support an otherwise uncorroborated defense. Defendant has not demonstrated that his trial counsel failed to perform in a reasonably effective manner and he has not demonstrated that there is a reasonable probability that, but for this alleged substandard performance, the outcome of the proceeding would have been different.

## VI. CONCLUSION

For the foregoing reasons, we affirm defendant's conviction for murder based upon accountability. Also, we grant the State's request for fees in the amount of $100 for defending this appeal.

Affirmed.

GORDON, P.J., and SMITH, J., concur.