No. 3--03--0952
Filed January 25, 2006

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2005

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--605 |
| DELMIRO G. EGGLESTON, | ) ) | Honorable Clark Erickson, |
| Defendant-Appellant. | )Judge, Presiding. | |

_____

JUSTICE BARRY delivered the Opinion of the court:

_____

Defendant, Delmiro G. Eggleston, was charged in the Kankakee County circuit court with home invasion (720 ILCS 5/12--11(a)(3) (West 2002)) and unlawful use of weapons by a felon (720 ILCS 5/24--1.1(a)(West 2002)). In a bench trial, the trial court found defendant not guilty of home invasion and guilty of unlawful use of weapons by a felon. Defendant was sentenced to 16 years' incarceration in the Illinois Department of Corrections (IDOC). Defendant appeals his conviction and sentence, arguing that the trial court abused its discretion by refusing to appoint independent counsel to investigate his posttrial allegations of ineffective assistance of counsel. We hold that

the trial court properly denied defendant's request for new counsel. Accordingly, we affirm the judgment of the circuit court of Kankakee County.

FACTS

At the bench trial, Tasha Jackson testified that she was 29 years old, and she lived in a house in Kankakee. Lakiva Byrd lived around the corner from her. The defendant's cousin, Donnell Eggleston (Donnell), was Byrd's boyfriend. On October 1, 2002, Jackson went to Byrd's house twice to buy cocaine. She made her first trip around 10 a.m. Donnell was in the house with defendant. Jackson had known Donnell for about three months, and she had purchased cocaine from him previously. She did not know defendant at the time. She bought cocaine from Donnell and returned home. Approximately 30 minutes later, Jackson went back to Byrd's house to buy additional cocaine from Donnell. Jackson returned home once again.

At approximately 1:30 p.m., Jackson encountered Donnell while she was out walking. He told Jackson that someone had broken into Byrd's home, and that he believed that she was responsible. She told him he was wrong. Donnell then told her that he needed to search her house. She consented to the search.

Defendant joined them outside of Jackson's house. Jackson allowed Donnell to enter her house. Defendant also entered the house with Donnell. Defendant and Donnell proceeded to ransack Jackson's house. The two went upstairs for approximately 15 to 20 minutes. Jackson's father and her two children were in the house.

Jackson observed Donnell place a telephone call on his cellular phone. Defendant told Jackson that if he had a gun he would shoot both her and her father.

2

Donnell told her that he was looking for a gun, jewelry, narcotics and money that had been taken from Byrd's house. Donnell slapped Jackson twice across her face.

Approximately 30 minutes later, a man named Demarco Hampton arrived at Jackson's house. Donnell made Jackson sit in her living room and did not allow her to move. Donnell opened the front door and allowed Hampton inside. Jackson observed Hampton produce two guns from his waist. He gave one gun to Donnell and the other gun to defendant. Hampton had a third gun, which he kept himself. Hampton then left the house.

Defendant then took Jackson's father into a bedroom and tied him up with Christmas lights. Jackson became afraid that defendant and Donnell were going to kill her. She suggested that they go to see her cousin, Sampson Jackson (Sampson), because he might know something about the burglary. She and defendant then left the house and got into a car that had been parked outside. Donnell remained in Jackson's house.

A woman named Asia Wilson was in the driver's seat of the car. Defendant sat in the front passenger seat, and Jackson rode in the back. They traveled to the house of Sampson's girlfriend. Jackson and defendant got out of the car. Jackson went into the house to see Sampson.

Sampson testified that he was at his girlfriend's house at approximately 4:30 p.m. when Jackson arrived. He observed defendant standing behind Jackson. Sampson agreed to go with Jackson and defendant. Jackson, Sampson, and defendant got into the car, and Wilson drove them back to Jackson's house.

3

While in the car, defendant asked Sampson where the gun was. Sampson replied that he did not know. When they arrived at Jackson's house, Jackson, Sampson and defendant got out. Wilson drove away. Sampson observed, for the first time, defendant with a gun in his hand. Inside the house, Donnell asked Sampson if he had broken into Byrd's home. Sampson answered that he had not. Defendant and Donnell went outside. Jackson then ran out of the back door to a neighbor's house and called the police, who arrived shortly thereafter. Defendant and Donnell had left the area.

Jackson and Sampson made statements to the police, which they each signed.

Kankakee City Police Detective Earl Cote testified that he was dispatched to Jackson's house at approximately 4:15 p.m. on October 1, 2002. He observed clothing strewn about the floor upstairs and downstairs. Later that day, he interviewed Sampson and reduced his statements to writing. He showed the typewritten statement to Sampson and told him to sign it only if it was truthful and accurate.

Kankakee City Police Detective Peter Nicholos testified that he was dispatched to Jackson's house at approximately 4:08 p.m. on October 1, 2002. At about 5:15 p.m., he interviewed Jackson and reduced her statements to writing. He showed the typewritten statement to Jackson and asked her to sign it if it was accurate. The statement indicated that Hampton drew two guns from his waist, and that he gave one gun to Donnell and kept the other for himself. The statement made no mention of Jackson's father being tied up by defendant. Detective Nicholos asked Jackson to have her father come to the police station to make a statement. Jackson's father did not contact the police. Jackson identified photographs of defendant, Donnell, and Demarco Hampton

4

from a series of photos. When she selected defendant's photograph, she told Detective Nicholos that she had seen defendant in her house with a gun.

Kankakee City Police Detective Patrick Kane testified that he was dispatched to Jackson's house at approximately 4:08 p.m. on October 1, 2002. He interviewed Jackson's neighbors, including Lakiva Byrd. Byrd told him that her house had been burglarized. Detective Kane obtained information as to defendant's possible whereabouts and sent an officer to a residence in Kankakee in search of defendant.

Sergeant Charles Curwick of the Kankakee City Police testified that on October 1, 2002, Detective Kane directed him to proceed to a residence in Kankakee with other officers at approximately 7:50 p.m. At the residence, Officer Curwick and others were allowed inside by Yakisha Butler. Officer Curwick discovered defendant standing in the shower, clothed. Officer Curwick placed defendant under arrest.

The parties stipulated that defendant had been convicted of a felony in Illinois and was on parole on October 1, 2002. The parties further stipulated that Yakisha Butler and Lakiva Byrd would testify that they observed, and were with, defendant at various times on October 1, 2002, and that they did not observe a gun on his person.

Defendant testified that he was 26 years old and lived in Rock Island. He admitted to having been convicted of aggravated car jacking and delivery of a controlled substance. He further admitted that he was on parole. He traveled to Kankakee a couple of days before October 1, 2002, to check on an outstanding warrant. He stayed the night of November 30, 2002, at Byrd's house with his cousin, Donnell. Jackson came to the house twice on the morning of October 1, 2002. On the second visit, Jackson brought a gym bag filled with meat and offered to trade it for cocaine or money.

5

Jackson subsequently performed oral sex on defendant and Donnell, and she obtained cocaine from Donnell.

At approximately 2 p.m., Latrell Lowe, a friend of defendant, drove defendant and Donnell around town for about half an hour. Lowe drove to an unspecified location, and Donnell exited the car. Lowe then returned defendant to Byrd's house. He placed a telephone call to Donnell, who came to the house. A search of the house revealed that Byrd's jewelry, a gun, and money were missing.

The two went to Jackson's house and questioned her about the missing items. Jackson denied taking anything from Byrd's house, and she allowed defendant and Donnell to enter her house and search it. Byrd was also in Jackson's house during the search. Jackson was "high" and frantic. Defendant recovered rings and a chain with Byrd's name on it in the closet. Jackson denied taking the items. She said she knew who took the jewelry, and she asked to be taken to Sampson's house. Defendant telephoned Asia Wilson and asked her for a ride. Wilson arrived at Jackson's house, and she drove defendant and Jackson to Sampson's house.

At Sampson's house, Sampson answered the door. Jackson told Sampson to return the items he had taken and asked him why he had broken into Byrd's house. Sampson denied the accusation. He then took $400 from his pocket, gave it to defendant, and said that "Pooter" had given the money to him. Defendant asked him if he had the gun. Sampson said that he would take them to it. Sampson, Jackson and defendant got into Wilson's car, and Wilson drove them to Jackson's house. Inside Jackson's house, Sampson removed a gun from his back pocket and gave it to Donnell.

6

Donnell identified the gun as belonging to him. Donnell then told Byrd to call the police, and he and defendant left.

Defendant denied possessing a gun on October 1, 2002. He stated that Donnell did not have a gun until Sampson handed the gun to him. Defendant knew Demarco Hampton. He stated that Hampton was not at Jackson's house. Defendant admitted that he told the police that he was not in Jackson's house on October 1, 2002. He stated that he did not inform the police as to what happened in Jackson's house because he was scared.

On rebuttal, Sampson denied giving $400 to defendant and giving a gun to Donnell. Jackson denied offering to exchange a bag of meat for cocaine and performing oral sex on either defendant or Donnell. She also denied that any stolen jewelry was recovered in her house. She further denied observing Sampson give $400 to defendant or a gun to Donnell.

At the close of the trial, the trial court found defendant guilty of unlawful use of weapons by a felon and not guilty of home invasion.

At the sentencing hearing, on November 5, 2003, the trial court denied defendant's motion for a new trial. Defendant then exercised his right of allocution. He stated that, at Donnell's trial, Jackson testified that defendant did not have a gun. He also asserted that Byrd's stipulated testimony was inadequate. He claimed that Byrd would have testified that she was at Jackson's house and that she did not observe any guns. Additionally, he believed that Jackson's father should have been called as a witness because he was present in Jackson's house and could testify that defendant and Donnell recovered stolen property there.

The trial court asked defense counsel about defendant's arguments regarding potential witnesses who were not called to testify. Defense counsel stated that, though his recollection was unclear, his decisions regarding witnesses were a matter of trial tactics. He stated that he based his decisions upon his assessment of the relationships of all who were involved in the case and his belief that the State had failed to present sufficient evidence to convict defendant beyond a reasonable doubt. The trial court found that the claims defendant raised in his allocution statement were a matter of trial tactics. The trial court then sentenced defendant to 16 years' incarceration in the IDOC.

On December 1, 2003, the trial court received a letter from defendant questioning defense counsel's alleged failure to call several witnesses who may have bolstered his defense. In response to the letter, the trial court conducted a hearing pursuant to People v. Baltimore, 292 Ill. App. 3d 159, 685 N.E.2d 627 (1997), on December 16, 2003. The purpose of the hearing was to determine whether new counsel should be appointed to represent defendant in investigating his allegations. The trial court read defendant's letter into the record and noted that the letter would be incorporated into defendant's motion to reconsider.

The trial court then questioned defendant about the allegations in his letter. Defendant stated that: (1) Asia Wilson would have testified that she did not see him with a gun, and that the situation in the car was not "hostile"; (2) Latrell Lowe would have supported defendant's testimony that Jackson tried to sell them meat at Byrd's house; and (3) Demarco Hampton would have denied bringing guns to Jackson's house and giving them to defendant and Donnell. Defendant admitted that he did not talk to any of these witnesses as to what their testimony would be, and that he gave defense counsel

8

these names one hour before his trial was to begin. He claimed to have attempted to send a letter to defense counsel in advance of the trial with this information, but the letter was returned to him.

Defense counsel stated that he discussed trial tactics with defendant, including the sufficiency of evidence necessary to support a conviction. He also stated that he had sufficient time to meet with defendant prior to trial to review the evidence and prepare the case. He could not recall when or how often he met with defendant. The assistant State's Attorney reminded the trial court that defendant had an opportunity to continue his case before the trial began, due to the original judge's schedule conflict, but, instead, defendant demanded to have his trial, which began the next day.

The trial court found that there was no basis to appoint new counsel to represent defendant in his posttrial allegations of ineffective assistance of counsel.

ANALYSIS

On appeal, defendant contends that the trial court erred by not appointing him new counsel to investigate his pro se post-trial claims of ineffective assistance of counsel. Defendant contends that his trial counsel failed to call certain witnesses and present impeachment evidence. We disagree.

A defendant's assertion that trial counsel was ineffective does not guarantee him new counsel. Baltimore, 292 Ill. App. 3d 159, 685 N.E.2d 627. However, when a defendant raises a pro se claim of ineffective assistance of counsel, the trial court should review the factual basis for the claim. People v. Bull, 185 Ill. 2d 179, 705 N.E.2d 824 (1998). When conducting a preliminary investigation of a defendant's pro se claim of ineffective assistance of counsel, the trial court may base its evaluation of the

9

defendant's allegations on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. People v. Gilmore, 356 Ill. App. 3d 1023, 828 N.E.2d 293 (2005).

Where the trial court determines that the defendant's claims pertain only to matters of trial strategy, the pro se motion may be denied without appointing new counsel. Bull, 185 Ill. 2d 179, 705 N.E.2d 824. Matters such as whether to put a witness on the stand at trial are typically matters of trial strategy. People v. Enis, 194 Ill. 2d 361, 743 N.E.2d 1 (2000). The trial court's finding that it is unnecessary to appoint new counsel to present a defendant's claims of ineffective assistance will not be disturbed on appeal unless the court's ruling is manifestly erroneous. People v. Woodson, 220 Ill. App. 3d 865, 581 N.E.2d 320 (1991).

In the instant case, the judge reviewed each allegation in defendant's allocution statement and in his pro se letter. At the sentencing hearing, and again at the Baltimore hearing, the trial court discussed the allegations with defendant and with defense counsel. The trial court determined that there was no factual basis for defendant's claims, and as a result, he did not appoint new counsel to represent defendant.

On appeal, defendant alleged in his opening brief that Jackson testified at Donnell's trial that defendant did not have a gun on October 1, 2002, and that testimony should have been introduced for impeachment purposes. Defendant further alleged that the following witnesses should have been called to testify: (1) Lakiva Byrd; (2) Jackson's father, Walter Westbrook; (3) Asia Wilson; and (4) Demarco Hampton.

As to Jackson's testimony at Donnell's trial, defendant concedes that the trial transcript refutes his claim. Jackson testified, at both trials, that she observed Hampton

10

give a gun to both defendant and Donnell.  Thus, there was no factual basis for this claim.

However, defendant further asserts that evidence adduced at Donnell's trial about a prior statement made by Jackson should have been introduced at his trial.  At Donnell's trial, Jackson admitted to signing a written statement which indicated that: (1) she did not observe defendant with a gun; (2) the matter was a misunderstanding; and (3) she would like to drop the charges.  Jackson further stated that she wrote and gave this signed and notarized statement to Byrd because she was harassed "every day" by phone calls and personal visits at her home made by "people" trying to coerce her into dropping the charges.  Although Jackson admitted that she would generally be willing to lie in order to stop being harassed, she did not indicate that the police coerced her into filing charges.  Rather, Jackson implied that defendant, Byrd or individuals closely associated with defendant pressured her into writing that she wanted to drop the charges.

Moreover, Jackson did not give her statement to the police.  Instead, she gave the statement to Byrd.  That defense counsel chose not to use this statement was a matter of trial strategy.  Had he introduced the statement, the State would likely have been able to show that defendant coerced her into writing it.  Thus defendant's credibility, and not Jackson's, would have been at risk.

We further note that at defendant's trial Detective Nicholos testified that the statement he took from Jackson indicated that Hampton drew two guns from his waist, and that he gave one to Donnell and kept the other for himself.  Thus, the statement that defendant argues his counsel should have introduced into evidence would have

11

been merely cumulative at best. Though Nicholos also stated that Jackson told him that she had seen defendant in her house with a gun, the evidence of a prior written statement introduced in the instant case better served the purpose of attempting to discredit Jackson than the statement Jackson gave to Byrd.

As to the other witnesses, defendant claims that Lakiva Byrd was present at Jackson's house, and that she would have testified that she did not see any guns. At trial, the parties stipulated to Byrd's testimony. The stipulation indicated that Byrd would testify that she was with defendant at various times on October 1, 2002, and she did not observe him with a gun. Byrd's live testimony would not have added any more than the stipulation already covered. Moreover, it would have subjected Byrd to cross-examination, which may have discredited her testimony, based on her involvement in the case. Byrd was Donnell's girlfriend, and also the victim of an alleged burglary. Defendant and Donnell blamed Jackson for the burglary. A cross-examination of Byrd may have exposed Byrd's bias against Jackson. Defense counsel stated that he took into account the relationships of the individuals involved in the case in determining which witnesses to call. It is reasonable to conclude that counsel perceived an advantage to introducing Byrd's testimony by stipulation. Thus, the decision to proceed by stipulation was one of trial strategy.

With regard to the remaining witnesses, defendant's assertions are based entirely on speculation. Defendant alleges that Walter Westbrook would have testified whether he observed defendant in possession of a gun, and whether defendant tied him up. Defendant did not know what Westbrook would have testified to. Westbrook did not give a statement to police. Defendant has not provided an affidavit or any other

12

evidence of what Westbrook's testimony would have been. Thus, there is no factual basis for this claim.

Additionally, defendant asserts that defense counsel was negligent for failing to call Asia Wilson to testify. Wilson was the driver of the car that transported defendant and Jackson to Sampson's girlfriend's house, and then back to Jackson's house. Wilson did not enter Jackson's house at any time. In fact, there is no evidence in the record that Wilson ever got out of her car. She drove away after dropping off defendant, Jackson, and Sampson at Jackson's house. Thus, her proposed testimony that she did not see defendant with a gun may have merely been cumulative to Sampson's testimony that he did not see a gun in the car. Sampson did not observe defendant in possession of a gun until after they got out of the car at Jackson's house. Moreover, this argument is mere speculation on defendant's part, as he admitted that he did not communicate with Wilson as to whether she would testify or what her testimony would be. Thus, there is no factual basis for this claim.

Finally, defendant argues that defense counsel should have called Demarco Hampton as a witness, because he would have allegedly testified that he did not bring guns to Jackson's home. Again, defendant speculates as to what Hampton's testimony might have been. Defendant does not have any affidavits or other evidence that would support a claim of ineffective assistance of counsel for failure to call witnesses whose testimony would support an otherwise uncorroborated defense.

In People v. Redmond, 341 Ill. App. 3d 498, 793 N.E.2d 744 (2003), the court rejected the defendant's claim of ineffective assistance of counsel under circumstances similar to the instant case. We recognize that the court in Redmond decided the issue

13

of whether defense counsel rendered ineffective assistance, rather than whether new counsel should be appointed to investigate the defendant's posttrial claims of ineffective assistance. Redmond, 341 Ill. App. 3d 498, 793 N.E.2d 744. However, we find the reasoning of that court instructive.

In its opinion, the court stated, "[D]efendant merely speculates as to the contents of the potential witnesses' testimony. He does not have any affidavits or other evidence that would support a claim of ineffective assistance of counsel for failure to call witnesses whose testimony would support an otherwise uncorroborated defense." Redmond, 341 Ill. App. 3d at 516, 793 N.E.2d at 759. The same issue exists in the instant case. Defendant has not produced any evidence whatsoever to support his claims. Defendant's argument as to what other witnesses would testify is insufficient.

We conclude there was no showing that defense counsel neglected defendant's case. People v. Ramey, 152 Ill. 2d 41, 604 N.E.2d 275 (1992). Our review of the record persuades us that defense counsel vigorously and ably represented his client. Notably, defendant was found not guilty of home invasion. Since the trial court correctly determined that there was no factual basis to support defendant's ineffective assistance of counsel claims, it was not required to appoint new posttrial counsel to assist defendant.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Kankakee County is affirmed.

Affirmed.

SCHMIDT, P.J. concurring. MCDADE, J. dissenting.

14

JUSTICE McDADE, dissenting:

_____

_

The majority affirms the decision of the circuit court of Kankakee County refusing to appoint independent counsel to investigate defendant's posttrial allegations of ineffective assistance of counsel and upholding his conviction for unlawful use of weapons by a felon and his sentence of 16 years in the Illinois Department of Corrections. For the reasons that follow, I cannot agree with that holding and therefore respectfully dissent.

The issue before us is whether there was a sufficient factual basis to warrant the appointment of independent counsel to investigate and present defendant's ineffective assistance claims. We do not consider whether he would have prevailed on his allegations, as was the issue in *People v. Redmond*, 341 Ill. App. 3d 498, 793 N.E.2d 744 (2003), on which the majority significantly relies. There is, at this point, no need for defendant to satisfy either prong of the test for ineffective assistance articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

It seems to me that the "instruction" the majority garners from *Redmond* mandates the appointment of independent counsel. The *Redmond* court found -- as does the majority -- that defendant's claims of his attorney's shortcomings were too speculative to warrant a finding of ineffective assistance because he "does not have any affidavits or other evidence that would support a claim of ineffective assistance of counsel for failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *Redmond*, 341 Ill. App. 3d at 516, 793 N.E.2d at 759. Although the majority <u>acknowledges</u> that the issue in *Redmond* is different from that we have on review in this case, it nonetheless contradicts itself to conclude: "The same issue exists in the instant case. Defendant has not produced any evidence whatsoever to support his claims. Defendant's argument as to what other witnesses would testify is insufficient." Slip opinion at page 16.

The majority and the State fault a *pro se*, incarcerated defendant for a failure to produce affidavits and other evidence of ineffective assistance. Is that not exactly what independent counsel is supposed to do?

Defendant has not, in fact, produced affidavits. What he has produced, however, is the testimony of his trial counsel that:

> (1)  his trial strategy was based on the relationships of the parties and his belief that the State's evidence was insufficient to prove defendant guilty beyond a reasonable doubt (from which a reasonable inference may be drawn that he did not anticipate the need for nor prepare for the presentation of an aggressive defense); and

16

(2) his recollection was not clear at the hearing but he "guess(ed)" his decision as to which witnesses to call was a matter of tactics. There was also no indication that he even interviewed some of the witnesses whose testimony, even if not exculpatory, might have affected an assessment of defendant's credibility.

In addition, defendant has presented claims of possible neglect by trial counsel that warranted further investigation by independent counsel. Specifically he asserts that:

(1) by stipulating to the testimony of Lakiva Byrd rather than calling her as a witness, counsel gave up defendant's possible opportunity to elicit, on either direct or cross examination, that she did not see defendant with a gun at any time or times the State deems relevant;

(2) by not calling Walter Westbrook, or apparently even interviewing him (although counsel knows Tasha Jackson claimed defendant had tied up Westbrook after he had allegedly been given the gun by Demarco Hampton), counsel gave up defendant's possible opportunity to show Westbrook was never tied up by defendant or ever saw him with a gun;

(3) by not calling, or apparently even interviewing, Demarco Hampton, counsel gave up defendant's possible opportunity to show that Hampton brought only two guns to Jackson's house and had not given one to defendant (as Jackson claimed in her initial sworn statement); and

17

(4)     by not calling Asia Wilson, counsel gave up defendant's possible opportunity to secure her testimony that she did not see him with a gun at any time that day and that there was no "hostile situation" in the car as she was driving Tasha, Sampson and defendant back to Tasha's house.

Defendant -- incarcerated *pro se* -- is in no position to support his claims in the requisite manner without representation. The majority argues, in circular fashion, that a record that lacks allegedly relevant testimony is sufficient to refute defendant's claim that his attorney was ineffective <u>because</u> he failed to produce that relevant testimony. The majority suggests that if an investigation by independent counsel were to show that:

(1)     Byrd was present in the house and did not see defendant with a gun there;

(2)     Westbrook was not tied up by defendant and did not see defendant with a gun; and

(3)     Hampton would testify that he did not give a gun to defendant.

That testimony, together with the earlier testimony of Byrd, Wilson, and defendant that he did not have a gun, would not be sufficient to overcome the trial testimony of Jackson that <u>contradicted</u> her earlier sworn statement that defendant did not in fact have a gun.

The record is clear that Tasha Jackson lied under oath. Either she lied at trial or she lied in her earlier directly contradictory sworn statement. Indeed, the trial court noted that corroboration was "important because Tasha Jackson's testimony

18

standing alone is suspect."[1]  She was clearly the strongest witness for the State.  In light of this, I think defendant's claim that there were witnesses with relevant testimony that his attorney did not interview and did not call warrants investigation by someone in a position and with the knowledge to investigate completely.  Clearly defendant, *pro se* and incarcerated, was not that someone.

I believe counsel should have been appointed to investigate defendant's claims of ineffective assistance and therefore I respectfully dissent from the majority's contrary decision.

---

[1]Defendant points out that the corroboration specifically mentioned by the court was the agreement between Tasha and her cousin Sampson Jackson that the hair color of the driver (Asia Wilson) was black and blonde.  Defendant suggests that information provided by trial counsel in a posttrial motion that Tasha had testified at Donnell's trial that the driver's hair was reddish blonde might have shaken the court's already-strained acceptance of her credibility.