2020 IL App (1st) 171442-U
No. 1-17-1442

SECOND DIVISION
June 23, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15CR205 |
| | ) | |
| MARIO TATE, a.k.a. ROLAND TURNER, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Joseph M. Claps, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defendant's criminal sexual assault conviction affirmed where the circuit court properly found that he was not denied his constitutional right to effective assistance of trial counsel following a *Krankel* hearing.  Defendant's constitutional challenges to the Illinois Sex Offender Registration Act dismissed where the requirement that he register as a sex offender and be subject to the other mandates and restrictions embodied in the Act were collateral consequences of his criminal sexual assault conviction and as such, his claims were not subject to review on direct appeal from his conviction.

¶ 2    Following a bench trial, defendant Mario Tate, a.k.a. Roland Turner, was convicted of criminal sexual assault and was sentenced to 15 years' imprisonment.  He also became subject to

the registration requirements of the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq*. (West 2014). On appeal, defendant contends that he was denied his constitutional right to effective assistance of trial counsel. He further contests the constitutionality of SORA. For the reasons explained herein, we affirm defendant's conviction and dismiss his constitutional challenge to SORA.

¶ 3       BACKGROUND

¶ 4       On November 30, 2014, following a night out with several friends, including long-time acquaintance, L.P., defendant was arrested and charged with criminal sexual assault. Defendant elected to waive his right to be tried by a jury and instead elected to proceed by way of a bench trial.

¶ 5       At trial, L.P., age 35, testified that she had known defendant since she was approximately 3 years old and that she considered him to be a "family member." On November 29, 2014, she celebrated defendant's birthday with her brother, Jerrold, her cousin, Michael, and two acquaintances, Sheila "Missy" Black and Yvette Howzell. The group went to several clubs that night where they consumed alcohol. At approximately 4 a.m., the group returned to her second-floor apartment located at 8443 South Bennett. Her two children, ages 13 and 8, were also present in the apartment, but were asleep. Everyone ultimately left her apartment except for defendant. L.P. explained that she agreed to permit defendant to stay at her apartment because "he was under the influence" of alcohol and he was "like family."

¶ 6       After everyone else had left her apartment, she and defendant conversed in her kitchen. They talked about zodiac signs and defendant informed her that they were "compatible" based on their respective signs. Defendant then requested L.P. to make him something to eat. As she attempted to do so, defendant stated, "Come here, b****" and "grabbed" her "aggressively around

[her] waist." With his hands around her waist, defendant asked, "Why you so sexy and so beautiful?" L.P. responded, "I'm not sexy. I'm not beautiful." Defendant then stated, "Give me a kiss, b****" and grabbed her by the back of her neck and her shoulder blades, pulled her close to him, and bit her lips. L.P. told defendant "No. Why you doing this? We like family." She also asked defendant how she thought her brother "would feel about this," but defendant responded, "B****, your brother rather see you with me than anybody else" and relayed that he always knew she was going to be beautiful ever since he saw her "growing up as a little girl." Defendant then stated, "B****, you gonna give me some of that pussy" and began looking through her purse.

¶ 7 L.P. did not observe defendant remove anything from her purse and told him that she was "fittin' to go lay down" and that he could sleep in her daughter's empty bedroom. Defendant responded, "Nah, b****, I'm going in the room with you." L.P. told defendant, "no" and again reminded him that he was "like family;" however, defendant simply followed her into her bedroom. He then instructed her to remove her pants, and when L.P. refused to do so, defendant "aggressively" removed her pants and underwear. After removing her clothing, defendant pushed L.P. onto her bed. Defendant then instructed her to lay down, but when she refused, he drew back his fist and displayed a "very gruesome look on his face." L.P. became scared so she "just did what he told [her] to do."

¶ 8 As she lay on the bed, defendant maneuvered between her legs and began "sucking and biting on [her] vagina real hard." L.P. asked defendant to "stop" and again reminded him that they were "like family," but "it seemed like the more [she] responded to him the worse it got." After defendant finished sucking and biting her vagina, he got up, removed his clothing, and "jumped in the air like he was getting ready to dive into a pool." He dove on top of her and "shoved himself into [her] vagina." L.P. continued to tell defendant to "stop" throughout "the whole duration" of

her assault. She never raised her voice, however, because she was concerned for her own safety and for the safety of her children. After he finished having sex with her, defendant rolled onto her bed. L.P. began crying and "patted" defendant's back to see if he was asleep. When he did not move, L.P. remained in her bed for several minutes before she got up and checked on her children who were still asleep. She then ran to her neighbor's house. After she relayed what had occurred, her neighbor called the police. When officers arrived at the scene in response to the call, L.P. spoke to them and reported what defendant had done to her. L.P. was then transported by ambulance to South Shore Trinity Hospital. At that time, she was experiencing vaginal pain as well as shoulder soreness.

¶ 9   On cross-examination, L.P. testified that defendant had celebrated Thanksgiving with her and her family two days prior to the assault. Everything was "fine" between her and defendant on that date. She had also spent time with defendant before they went out to celebrate his birthday on November 29, 2014. She explained that defendant, her brother, and cousin arrived at her apartment sometime between 1 p.m. and 4 p.m. that day and that they started drinking beer and vodka, which she also consumed, before they left to go out for the night around 8 or 9 p.m. She recalled that the group first went to defendant's aunt's house, then to a barber shop where they danced and drank for several hours. L.P. denied that she danced and flirted with defendant at the barber shop. She estimated that they left the barber shop around 1 a.m. and drove to a club where they met up with Missy and Yvette. L.P. admitted that she consumed more alcohol in the car on the way to the club and had one more drink at the club. She denied dancing or engaging in any physicality with defendant at the club. The group then relocated to a second club where she consumed one additional drink. L.P. acknowledged that she danced with defendant "a little" at the second club but stopped when her brother approached them. She then spent the rest of the

night hanging out with her brother before everyone returned to her apartment for a "short period" of time. L.P. admitted that she never told defendant to leave her apartment that evening after everyone else had left for the night.

¶ 10    Chicago Police Officer James Brown testified that on November 30, 2014, at approximately 6:15 a.m., he was dispatched to a two-flat apartment building located at 8443 South Bennett in Chicago. Upon his arrival at that location, he spoke to L.P., whose demeanor he described as "upset, crying, and intoxicated." After speaking to L.P. on the first floor of the building, he and two other responding officers entered the second-floor unit and removed L.P.'s two children from the apartment. The officers then took defendant, who had been sleeping in another bedroom, into custody. On cross-examination, Officer Brown testified that he did not observe any visible signs of physical injury to L.P. when he encountered her that morning.

¶ 11    The parties stipulated to the testimony of Dr. Albert Smith and registered nurse Catina Parker, the medical professionals who administered a sexual assault kit to L.P. when she arrived at South Shore Hospital in the early morning hours of November 30, 2014. Pursuant to the stipulation, the witnesses would testify that they observed no visible bruising or scarring on L.P.'s body, but that her vaginal region was swollen and tender to touch and she exhibited pain in her abdominal area. There was also visible vaginal bleeding and vaginal discharge that was moderate, thick, and cloudy. At the hospital, L.P. reported that her last menstrual cycle occurred two weeks earlier and that her "sexual intercourse history was greater than two months ago." L.P. relayed that she had screamed when defendant entered her bedroom. When Parker first examined her at approximately 7:10 a.m., L.P. was "crying uncontrollably."

¶ 12    After presenting the aforementioned evidence, the State rested its case and the defense moved for a directed finding, but the motion was denied.  Thereafter, the defense presented a series of witnesses including testimony from defendant.

¶ 13    Michael Bruce, L.P.'s cousin though marriage, testified that he has known her all her life. He described defendant as his "cousin-in-law" and someone he has known for approximately 37 years.  On November 29, 2014, he, L.P., and defendant got together to celebrate defendant's 45th birthday.  Bruce picked up defendant from his aunt's house and the two went to a liquor store where they purchased vodka and some beers.  They subsequently met up with L.P. and her brother, Jerrold, at her house at approximately 10:30 p.m.  The group stayed at L.P.'s house for about 40 minutes where they consumed vodka and beers. They then decided to go out for the night.  Their first stop was the barber shop.  Although Bruce recalled observing L.P. dancing at the barber shop, he did not recall whether he saw her dancing with defendant.  After the barber shop, the group went to a club.  Bruce observed L.P and defendant dancing together at the club.  As they danced, they made physical contact.  The group then relocated to a second club before they returned to L.P.'s apartment.  Bruce stayed at L.P.'s apartment for approximately 15 minutes before he left to return home.  Bruce "didn't feel like dropping [defendant] off" so Jerrold recommended that defendant stay at L.P.'s house.  Bruce testified that he thought Jerrold was also going to be staying the night at L.P.'s apartment as well.

¶ 14    Sheila "Missy" Black testified that she is a friend of Bruce's and that she met defendant through Bruce.  On November 29, 2015, she met up with Bruce, defendant, and L.P. at a club.  By that time, she had known defendant for approximately one year.  She had talked to him on the phone but had only met him in person on one other prior occasion.  She had not met L.P. until that night. Black testified that she observed defendant and L.P. drinking, dancing together, and making

physical contact while at the club. At some point that night, defendant was holding her purse and she recalled that L.P. "got jealous and snatched it out of his hands." Black confirmed that she talked to defendant on the telephone following his arrest, but denied that he told her what to say in court.

¶ 15    Yvette Howzell testified that she and Black met up with defendant, Bruce, and L.P. at a club on November 29, 2014. She also observed L.P. and defendant dancing and making physical contact together at the club. In addition, she observed L.P., who appeared to be "upset," knock Black's purse of out defendant's hands that night.

¶ 16    Defendant identified himself as Roland Turner, but acknowledged that he also went by the names Mario Tate and Rio Jones. He further acknowledged that he had a criminal history that included a 2006 conviction for possession of a controlled substance and a 2007 conviction for unlawful use of a weapon. In November 2014, he resided in Minneapolis, Minnesota, but he came to Chicago at the end of the month to celebrate Thanksgiving and his birthday with friends and family, including L.P. and Bruce, who were both "cousins in law by marriage." Defendant, who is eight years older than L.P. testified that he has known her since she was 5 or 6 years old. On November 29, 2014, Bruce picked defendant up at his aunt's house, where he was staying while he was in Chicago, to celebrate defendant's birthday. They purchased some alcohol that they brought over to L.P.'s apartment, where she and her brother, Jerrold, were waiting. They began "drinking and having fun." The group then relocated to the barber shop where there was "a get together in the back." He and L.P. danced together the whole time they were at the barber shop. Thereafter, the group went to two separate clubs where he and L.P. continued to dance together "on and off." As they danced, they made physical contact. He testified that he and L.P. stopped dancing when Jerrold came around because he was "protective" of her.

¶ 17 That night, defendant also met up with Black, who was a friend of Bruce's girlfriend. According to defendant, Black was his "so-called" "prearranged" date for the night. He recalled that he was holding Black's purse for her at some point that night when L.P. approached him, "began to act belligerent" and knocked the purse out of his hands. L.P. and Black then "had words." Other than that incident, he and L.P. did not have any problems with each other that night. By the end of the evening things had "mellowed out" and were "cool" between them. After leaving the second club, the group returned to L.P.'s apartment. Defendant was not planning on spending the night there, but he had fallen and had cut his hand on a piece of glass so he went to her place to clean his cut and stop the bleeding. After he had done so, Jerrold and Bruce convinced him to stay there because Bruce did not want to drive defendant to his aunt's house.

¶ 18 Jerrold and Bruce then left and L.P. began to fix defendant something to eat. As she was doing so, they began flirting. Defendant explained that he "approached her" and was "google eyed" and began "telling her how beautiful she look[ed]." L.P. responded by smiling and giggling. When he asked her if she had a boyfriend, she told him to "stop playin'" and defendant began kissing her cheek and neck. L.P. did not move away from him or tell him to stop kissing her. Instead, she "[s]miled like boy, you don't know what you gettin' yourself into." After further conversation, defendant then "gave her a kiss on the mouth" and she kissed him back. They continued kissing until L.P. had to use the bathroom. Defendant paced while she was gone and when she returned, he told her that he was "fittin' to go." They began talking again and defendant gave her another kiss and said, "let me be with you, let me be with you." In response, L.P. told him to "shush" because her kids were sleeping, and then grabbed his hand and led him to her room. He denied aggressively forcing her into her bedroom or onto her bed.

¶ 19    When they entered her bedroom, defendant "planted another kiss on her," removed her pants, and performed oral sex on her. L.P. never told him to stop or expressed any discomfort that they were "like family." After performing oral sex on her defendant undressed and they had "regular sex." L.P. never asked him to stop as they engaged in vaginal sex. After they finished, defendant held L.P. in his arms and they began to talk. He asked her to fix him something to eat, but fell asleep before she returned to the bedroom. Defendant was then woken by three police officers. Defendant denied that he ever threatened or raised a hand to L.P. and testified that he "would never hurt" her.

¶ 20    On cross-examination, defendant admitted that he might "have been aggressive, a little bit more dominant" with L.P., but denied that he caused her any pain. He denied "biting" L.P.'s vagina when he performed oral sex, but admitted he gave her "a nibble." Although he was pretty drunk that night, defendant testified that he remembered everything that occurred.

¶ 21    Thereafter, the parties stipulated to the testimony of Chicago Police Department Detective Germaine DuBose, who was assigned to investigate L.P.'s criminal sexual assault allegation against defendant. As part of that assignment, Detective DuBose interviewed L.P. on November 30, 2013, at the Area South police station. During that interview, L.P. stated that she was on the last days of her menstrual cycle. She also stated that she had not had consensual sex within the last 72 hours. She also relayed that after the sexual assault, she rubbed defendant's back for five minutes to make sure he was asleep before she left the room. Detective DuBose would further testify that L.P. never said that defendant aggressively pushed her into her bedroom or that he jumped into the air and on top of her like he was diving into a pool.

¶ 22    After presenting the aforementioned evidence, the defense rested and the parties delivered closing arguments. The cause was continued and when the matter resumed, the court found defendant guilty of one count of criminal sexual assault. The court explained its ruling as follows:

"What it comes down to is the credibility of [defendant's] version of the events and the complaining witness in the charging document, L.P. *** So it comes down to who is the credible witness?

There is always going to be some conflict and prior statements and testimony. But taken as a whole, if I have to evaluate the credibility of witnesses, and there are a number of factors which are very clear. When I evaluate the credibility of these two witnesses, it is clear to me that the victim in this matter who testified clearly and convincingly and I believe the [S]tate proved beyond a reasonable doubt the allegation in count 1. Finding of guilty on count 1."

¶ 23    Following the verdict, defendant filed a *pro se* letter with the circuit court alleging various claims of ineffective assistance of trial counsel. After reviewing defendant's letter, the court conducted a preliminary inquiry of defendant's claims and found that some of the "things [he] was saying" did not "make sense" and that it was "not possible to determine" the validity of his claims absent a hearing. Accordingly, the court appointed another public defender to review defendant's posttrial *pro se* ineffective assistance of trial counsel claims and set the matter for a hearing in accordance with the Illinois supreme court's ruling in *People v. Krankel*, 102 Ill. 2d 181 (1984). Prior to the hearing, defendant's new court-appointed counsel filed a memorandum of law alleging several instances of ineffective assistance of trial counsel. Specifically, the memorandum alleged trial counsel was ineffective for: failing to introduce a sexually suggestive photograph of L.P. taken after the incident; failing to file a motion to bar the admission of defendant's prior convictions into

evidence; stipulating to impeachment evidence rather than presenting impeachment evidence through live witness testimony; and failing to present evidence about blood found on L.P.'s sheets.

¶ 24    *Krankel* Hearing and Posttrial Proceedings

¶ 25    At the hearing, defendant's trial attorney Samantha Slonim testified that she was provided with a picture depicting L.P. and Yvette Houzell in a sexually suggestive manner prior to defendant's bench trial; however, she "chose not to" introduce the picture at trial. She believed that the picture was "collateral" and not relevant; rather, it "would only serve to muddy the waters of [defendant's] defense," which was consent. Slonim also confirmed that she did not file a "*Montgomery* motion" to preclude mention of defendant's prior felony convictions at the trial. She explained that she did not file the motion because defendant had elected to receive a bench trial, but she would have filed a *Montgomery* motion had defendant elected a jury trial. Finally, Slonim acknowledged that she had subpoenaed and received pictures of L.P.'s bedroom, the scene of the purported assault, from the Chicago Police Department. One of the pictures depicts what appears to be two small blood droplets on a blanket. She did not introduce pictures of the blood or any other pictures of L.P.'s bedroom at trial. In addition, she did not seek to have the blood tested because defendant's case was solely about "consent" and "not a matter of whose blood it would have been."

¶ 26    Yvette Houzell testified that the picture in which she appeared with L.P. was taken about a "week after the so-called incident;" however, she could not remember the exact date that it was taken. She explained that she, Missy Black, and Michael Bruce had gone to L.P.'s residence to check on her. They stayed for about three hours. During that time, they consumed alcohol, danced, laughed, and hugged each other. Houzell recalled that she told L.P. that she had "nice boobs" and that L.P. pulled up her shirt and let Houzell touch them. Black took the picture of that interaction.

¶ 27 Black testified that she took the photo of L.P. and Houzell at L.P.'s residence "the night after the incident [was] supposed to have happened." She also confirmed that people were drinking, dancing, and laughing at L.P.'s residence the night the photograph was taken.

¶ 28 After presenting the aforementioned testimony, defendant's *Krankel* attorney entered a number of exhibits into evidence, including the relevant pictures, police reports, and trial transcripts. The court then took the matter under advisement. At a subsequent court date, the court found that defendant's ineffective assistance of counsel claims lacked merit because none of his trial attorney's alleged shortcomings would have altered the trial result.

¶ 29 Thereafter, the cause proceeded to a sentencing hearing, where the court was presented evidence in both aggravation and mitigation. After considering that evidence, the court sentenced defendant, who was subject to mandatory Class X sentencing due to his criminal history, to 15 years' imprisonment. In light of his conviction for criminal sexual assault, defendant automatically became subject to the sex offender registration requirements of SORA (730 ILCS 150/2(B), 150/3(a) (West 2012); however, the requirement that defendant register as a sex offender was not specifically incorporated into the circuit court's judgment. Defendant's postsentencing motion was denied and this appeal followed.

¶ 30 ANALYSIS

¶ 31 Ineffective Assistance of Counsel

¶ 32 On appeal, defendant argues that he was denied his constitutional right to effective assistance of trial counsel. He submits that the evidence submitted during his *Krankel* hearing "showed trial counsel unreasonably failed to pursue several issues that could have tipped the credibility contest in [his] favor." As a result, he requests that this court reverse his conviction and remand the matter for a new trial.

¶ 33    The State responds that defendant's ineffective assistance of counsel claims lack merit because his attorney's conduct was informed by "objectively reasonable decisions based on trial strategy" and because defendant "was not prejudiced by counsel's actions." Given that defendant was the recipient of competent legal representation, the State submits that his conviction for criminal sexual assault should be affirmed.

¶ 34    It is well-established that every criminal defendant has a constitutional right to receive effective assistance of counsel.  U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I § 8; *Strickland v. Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674, 691-92 (1984).    The right to effective assistance of counsel entails "reasonable, not perfect, representation."  *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79.  To prevail on a claim of ineffective assistance of trial counsel, the defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984) and establish that: (1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced defendant.  *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Baines*, 399 Ill. App. 3d 881, 887 (2010).  With respect to the first prong, the defendant must overcome the "strong presumption" that counsel's action or inaction was the result of sound trial strategy.  *People v. Jackson*, 205 Ill. 2d 257, 259 (2001); *People v. Shelton*, 401 Ill. App. 3d 564, 584 (2010).  " 'In recognition of the variety of factors that go into any determination of trial strategy, * * * claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review.' "  *Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (quoting *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002)); see also *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984) ("The issue of incompetency of counsel is always to be determined by the totality of

counsel's conduct.") To satisfy the second prong, the defendant must establish that but for counsel's unprofessional errors, there is a reasonable probability that the trial court proceeding would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). A defendant must satisfy both the performance and prejudice prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *People v. Evans,* 209 Ill. 2d 194, 220 (2004); *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008).

¶ 35    Defendant first argues that his attorney was ineffective for failing to file a motion to "prevent [him] from being impeached with prejudicial evidence of his prior convictions" in accordance with the Illinois Supreme Court's ruling in *People v. Montgomery*, 47 Ill. 2d 510 (1971), where the court held that a prior conviction may only be used to impeach a defendant where: (1) the crime was punishable by death or a term of imprisonment in excess of one year, or the crime involved dishonesty or false statements regardless of the punishment imposed; (2) less than 10 years has elapsed since the date of conviction of the prior crime or the release of the witness from confinement, whichever date is later; and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice. *Id.* at 516. The court's ruling was premised on the recognition that the admission of prior convictions against a defendant in a criminal trial poses a risk that the fact finder may infer that the defendant committed the crime for which his on trial based on his propensity for criminal activity as evidenced by his prior criminal history. *Id*.

¶ 36    In this case, evidence of defendant's criminal history was introduced at trial and the circuit court was apprised that he had been convicted of unlawful use of a weapon by a felon in 2007 and possession of a controlled substance in 2006. Defendant concedes that his prior convictions satisfy the first and second *Montgomery* factors. He argues, however, that the probative value of his prior convictions was "substantially outweighed by the danger of undue prejudice" and that the third

*Montgomery* factor was thus not satisfied. At the *Krankel* hearing, defendant's trial attorney testified that she elected not to file a *Montgomery* motion to prevent defendant's prior convictions from being introduced at trial because defendant had elected to be tried via bench trial rather than a jury trial. Although an attorney's decision whether or not to file a motion is considered a matter of trial strategy and will generally not support an ineffective assistance of counsel claim (*People v. Wilson*, 164 Ill. 2d 436, 454-55 (1994); *People v. Steels*, 277 Ill. App. 3d 123, 127(1995)), we question counsel's decision not to file a *Montgomery* motion based simply on the nature of defendant's trial. Nonetheless, even if counsel's decision not to file a *Montgomery* motion was unreasonable, we are unable to find that defendant was prejudiced by counsel's representation in this vein.

¶ 37 We note that aside from the brief mention of defendant's prior convictions during his testimony, his criminal history did not play a part in his trial. Although the trial was based largely on the divergent accounts provided by L.P. and defendant, neither party referenced his prior convictions when voicing their respective arguments concerning the credibility to afford his testimony. Similarly, the record reflects that the circuit court did not reference defendant's prior convictions when it convicted defendant of criminal sexual assault; rather, the court's verdict was based on its evaluation of the testimony that L.P. and defendant provided at trial, and its conclusion that L.P. was the witness who testified more "clearly and convincing[ly]." Indeed, at the conclusion of the *Krankel* hearing, the circuit court specifically found that a *Montgomery* motion would have had no effect on the outcome of defendant's trial, stating:

> "As far as raising *Montgomery* issues, or regarding the defendant's prior
> convictions the testimony by his attorney was that since it was a bench trial she didn't think
> he had to raise it. That in my mind is clearly not the requirement for an attorney. But it's

clear to me then and it's clear to me now that I chose not to use his felony conviction as impeachment material in assessing his credibility. My assessment of []his credibility was based on his testimony, the content, the manner in which he testified, versus that of the complaining witness, irrespective of his felony conviction. I clearly did not choose to use those in assessing his credibility, so they were no value to me."

¶ 38 Ultimately, because the record demonstrates that defendant's prior convictions had no impact on the trial result, defendant's contention that his trial attorney's failure to file a *Montgomery* motion to bar the introduction of his criminal history at his trial deprived him of his constitutional right to effective assistance of counsel has no merit. *C.f. People v. Sanchez*, 404 Ill. App. 3d 15, 19 (2010) (finding that the defendant's attorney rendered ineffective assistance when counsel failed to object to the State's introduction of the defendant's prior conviction for impeachment purposes where the "trial court expressly relied upon the defendant's prior conviction, twice stating that the conviction weighed against his credibility" and it was thus evident that the defendant's criminal history impacted the trial result).

¶ 39 Next, defendant argues that his attorney was ineffective for failing to introduce blood evidence. At trial, he testified that he had cut his hand on a piece of glass before returning to L.P.'s apartment at the end of the night. Two small blood droplets were subsequently found on a blanket in L.P.'s bedroom and the blood was tested and found to be defendant's. He contends that his attorney was ineffective for failing to introduce pictures of the bloodstains and the results of the forensic testing. According to defendant, this evidence would have corroborated his testimony that he was injured and would have undermined L.P.'s testimony that she was the victim of a sexual assault, since none of her blood was found on the blanket or on any of her bedding. At the *Krankel* hearing, trial counsel explained that she did not introduce the blood evidence because she did not

believe that it was "of issue"; rather, the case hinged on the issue of consent and it was "not a matter of whose blood it might have been."

¶ 40    As a threshold matter, we note that decisions concerning the evidence to present at trial are considered matters of trial strategy that are generally immune from ineffective assistance of counsel claims. *People v. West*, 187 Ill. 2d 418, 432 (1999).  We also observe that the pictures of the bloodstains are not included in the record on appeal.  Although defendant submits that the evidence shows that there were bloodstains on L.P.'s bedsheets, the testimony in the record reflects that there were two droplets of defendant's blood found on a blanket in her bedroom.  Defendant's apparent mischaracterization of the blood evidence notwithstanding, the record does not support his argument that his attorney was ineffective for failing to present the evidence.

¶ 41    Initially, we note that while the presence of two droplets of defendant's blood *may* have corroborated his account that he had cut his hand earlier in the night, there is no way ascertain from the droplets alone whether they came from a cut on defendant's hand or a nosebleed or a scratch.  Moreover, as defense counsel correctly observed, the relevant issue in the case was that of consent.  There was no dispute that defendant was in L.P.'s bedroom on the night in question or that he had sexual contact with her.  Therefore, the presence of his DNA, including two droplets of blood, on a blanket in her bedroom is not surprising.  Although defendant suggests that the absence of L.P.'s blood "undermined [her] testimony that she had been forcefully sexually assaulted," that is not the case.  L.P. characterized defendant's conduct as aggressive but never testified that he struck her or drew blood during the assault.  Ultimately, neither the absence of L.P.'s blood nor the presence of a small amount of defendant's blood makes it more or less likely that the sexual contact between her and defendant was consensual.  See *People v. Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 401) (eff. Jan. 1, 2011) (explaining that "relevant evidence" is

that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Accordingly, based on the record, we are unable to conclude that trial counsel's determination that the blood evidence was irrelevant to the central issue of consent was unreasonable or that she was ineffective for failing to present that evidence. See *People v. Rush*, 294 Ill. App. 3d 334, 342 (1998) ("Counsel's failure to present irrelevant evidence is not incompetence").

¶ 42      Defendant, however, also suggests that the absence of L.P.'s blood was important because she had given inconsistent accounts of her menstrual cycle. Specifically, she had testified at trial that she was not on her period at the time of the incident but had relayed to Detective Germain Dubose that she was in the last days of her menstrual cycle. Initially, we note that the fact that L.P. provided inconsistent or unclear testimony about the timing of her menstrual cycle does not automatically obviate her credibility about the nature of her encounter with defendant, which she consistently described as nonconsensual to medical and law enforcement personnel. Moreover, given that the stipulated testimony of Detective Dubose contained details about L.P.'s account of her menstrual cycle, the blood evidence (*i.e.*, the presence of defendant's blood and the absence of L.P.'s blood) would have simply been cumulative of the evidence already presented and would not have altered the trial result. See *People v. Henderson*, 171 Ill. 2d 124, 155 (1996) (recognizing that "[t]rial counsel's performance cannot be considered deficient because of a failure to present cumulative evidence"). Therefore, defendant's claim that defense counsel was ineffective for failing to present blood evidence lacks merit.

¶ 43      Defendant next argues that his trial attorney was ineffective when she stipulated to "a fragmentary list of impeachment evidence of L.P., rather than presenting live testimony."

¶ 44     Initially, we note that although stipulated impeachment evidence is generally "no substitute for live, in-court impeachment," testimony (*People v. Mejia*, 247 Ill. App. 3d 55, 65 (1993)), "[d]ecisions concerning whether to call certain witnesses on a defendant's behalf are matters of trial strategy, reserved to the discretion of trial counsel," and as such, they "enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence ***" (*People v. Enis*, 194 Ill. 2d 361, 378 (2000)).

¶ 45     At trial, during the State's case in chief, the parties stipulated to the testimony of medical personnel who treated L.P. at South Shore Hospital in the early morning hours of November 30, 2014. Pursuant to that stipulation, Dr. Albert Smith and Nurse Catina Parker would provide details about L.P.'s demeanor, her physical state, and her account of the sexual assault.  Specifically, the medical personnel would testify although L.P. displayed no signs of bruising, she was "crying uncontrollably" and her vagina was swollen and tender to the touch.  In addition, there was some visible vaginal bleeding.  L.P. also presented with abdominal pain and reported that her last menstrual cycle occurred two weeks prior.  When describing the assault, she stated that defendant entered her room and that she screamed.  After the State rested, defense counsel presented the stipulated testimony of Detective Germaine Dubose, who took a statement from L.P. after the incident.  Pursuant to that stipulation, Detective Dubose would testify that L.P. relayed that Michael Bruce had told defendant to stay the night at her house; that defendant followed her into her bedroom; that she rubbed defendant's back when he fell asleep after the assault; that she had not engaged in consensual sexual intercourse within the previous 72 hours; and that she was on the last days of her menstrual cycle.

¶ 46     As defendant correctly observes, the two stipulations contained some details that were inconsistent with the testimony L.P. provided at trial.  For example, L.P. denied screaming prior

to the assault at trial. In addition, the information she provided to medical personnel about the timing of her menstrual cycle differed from the information she provided to Detective Dubose. Neither of the two stipulations, however, contradict L.P.'s testimony that she did not consent to engaging in sexual intercourse with defendant and that he sexually assaulted her. Although defendant suggests that live impeachment testimony would have been "far more powerful" because the witnesses could provide "greater detail," he fails to explain what additional details those witnesses could provide. See *People v. Eggleston*, 363 Ill. App. 3d 220, 227 (2006) (rejecting the defendant's claim that his attorney was ineffective for stipulating to testimony rather than calling live witnesses where there was no evidence that the live testimony would "have added any more than the stipulation already covered"). Moreover, he assumes that the unspecified additional details would be beneficial to him.

¶ 47    Ultimately, based on the record, we are unable to find that defense counsel's decision to proceed by way of stipulation rather than live testimony was unreasonable or that he was prejudiced by counsel's chosen trial strategy. Importantly, the stipulated testimony was clear and concise, and it is evident that the circuit court was aware of and considered inconsistencies in L.P.'s trial testimony when delivering its verdict. *Cf. People v. Williams*, 329 Ill. App. 3d 846, 856 (200) (finding that counsel was ineffective for proceeding by way of stipulation rather than live testimony where the stipulation "lack[ed] clarity" and was thus an "inadequate substitute for [live] impeachment testimony"). In finding defendant guilty, the court expressly acknowledged that the cases hinged on "the credibility of [defendant's] version of the events" versus the account provided by L.P. and stated:

> "*There is always going to be some conflict and prior statements and testimony.* But taken as a whole, if I have to evaluate the credibility of witnesses, *** there are a number

of factors which are very clear. When I evaluate the credibility of these two witnesses, it is clear to me that the victim in this matter [is] who testified clearly and convincing[ly] and I believe the [S]tate proved beyond a reasonable doubt the allegation in count I." (Emphasis added.)

Given that the court was aware of and expressly considered the inconsistencies in the witnesses' testimony prior to delivering its verdict, defendant fails to show that there is a reasonable probability that the trial result would have been different if the impeachment evidence had been presented through live witness testimony rather than stipulation. Defendant's ineffective assistance of counsel claim thus necessarily fails.

¶ 48 Finally, defendant suggests that his trial attorney was ineffective for failing to introduce into evidence a "sexually suggestive photograph of L.P." taken approximately one week after the incident in question. In the picture, L.P. is shown smiling and lifting her shirt while Yvette Howzell touches her breasts. Defendant submits that "such behavior is inconsistent with someone who was the victim of a forceful sexual assault" and that the picture was thus demonstrative evidence that L.P.'s testimony about the nature of her sexual prior encounter with him lacked credibility.

¶ 49 Upon review, we reject defendant's argument that his attorney's decision not to admit the photograph deprived him of his right to effective assistance of counsel. We reiterate that decisions concerning the evidence to present at trial are considered matters of trial strategy that are generally immune from ineffective assistance of counsel claims. *West*, 187 Ill. 2d at 432. When asked about the photograph during the *Krankel* hearing, trial counsel cited trial strategy as the reason that she

did not seek to introduce the picture at trial.[1] She explained that she believed the picture was "collateral" and "wasn't relevant" to the issue of whether L.P. consented to sexual contact with defendant. Moreover, counsel believed that the State would have "ample arguments in rebuttal" if the photograph was introduced. Indeed, having reviewed the photograph at issue, we question the relevance of the image and defendant's contention that it necessarily undermines L.P.'s testimony that defendant sexually assaulted her, as his argument rests on the outdated premise that there is a "correct" way that victims of sexual assaults should act. The mere fact that L.P. consented to take a sexually suggestive photograph with a female friend a week after the incident with defendant does not make it more or less likely that she consented to engage in sexual intercourse with defendant on the night in question. See *Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 401) (eff. Jan. 1, 2011) (explaining that "relevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Even if the photograph was relevant and admissible, defendant's claim that his trial attorney was ineffective for failing to introduce it necessarily fails because he cannot show that counsel's decision prejudiced him. At the conclusion of the *Krankel* hearing, the circuit court, after viewing the photograph, specifically found that "even if it would have been admitted and raised by the Defense [it] would not have changed the outcome of the trial." Indeed, given that the record demonstrates that the court's verdict was specifically informed by its consideration of the testimony about the assault that L.P. and defendant each provided at trial and the lack of evidence that the photograph would have altered the trial result, we reject defendant's ineffective assistance of counsel claim.

---

[1] We note that when initially questioned about the photograph when the court conducted its preliminary inquiry into defendant's *pro se* ineffective assistance of counsel claims, counsel indicated that she believed the picture was barred by the Illinois rape shield statute.

¶ 50    Having rejected each of defendant's individual ineffective assistance of counsel claims, we also necessarily reject his argument that the "cumulative effect" of his trial attorney's purported errors "undermined confidence in the outcome of the trial." See, *e.g., People v. Lacy*, 407 Ill. App. 3d 442, 467 (2011) (quoting *People v. Albanese*, 102 Ill. 2d 82-83 (1984)) (rejecting the defendant's claim that the cumulative effect of errors which do not individually rise to the level of ineffective assistance of counsel can collectively amount to ineffective assistance of counsel because " '[t]he whole can be no greater than the sum of its parts' "). We reiterate that effective assistance of counsel entails "reasonable, not perfect, representation" (*Wilborn*, 2011 IL App (1st) 092802, ¶ 79) and that when evaluating the competency of an attorney's representation, counsel's conduct must be viewed as a whole (*Mitchell*, 105 Ill. 2d at 15). We note that at trial, counsel cross-examined the State's witnesses, raised relevant objections, requested a judgment of acquittal at the conclusion of the State's case-in-chief, presented defense witnesses, and vigorously challenged the sufficiency of the State's case in opening and closing arguments. Ultimately, we find that counsel's conduct, when viewed in its entirety, fell within the range of competence required of attorneys.

¶ 51    Constitutional Challenge to SORA

¶ 52    Defendant next challenges the constitutionality of SORA, arguing that its "registration and notification scheme violates substantive due process because it is neither narrowly tailored to achieve a compelling state interest nor rationally related to the purpose of protecting the public from sex offenders." He further argues that the registration scheme also violates his right to "procedural due process because it fails to accord him an individualized assessment of whether he should be required to register" as a sex offender.

¶ 53    The State, in turn, submits that this court lacks jurisdiction to consider defendant's constitutional challenges to SORA.  In support, the State cites our supreme court's opinion in *People v. Bingham*, 2018 IL 122008, and argues that pursuant to that decision, "defendant cannot raise a constitutional challenge to the Illinois Sex Offender Registration Act on direct appeal from his criminal conviction which triggered its application."

¶ 54    In *Bingham*, the defendant was convicted of attempted criminal sexual assault in 1983. 2018 IL 122008, ¶ 1.  He was not required to register as a sex offender at the time of that conviction; however, subsequent amendments to SORA imposed a registration requirement upon him when he was convicted of theft decades later.  *Id.*  The defendant then mounted a constitutional challenge to SORA's registration requirement on direct appeal from his theft conviction, arguing that the registration requirement violated his substantive due process rights as well as *ex post facto* principles. *Id.* ¶ 14.  On review, the supreme court found that it lacked jurisdiction to resolve the defendant's constitutional claims.  In doing so, the court observed that a reviewing court's scope of review is constrained by Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967) to the "trial court's judgment and the proceedings and orders related to it."  *Id.* ¶ 16.  Specifically, in accordance with the rule, a reviewing court may only " '(1) reverse, affirm, or modify the judgment or order from which the appeal is taken; (2) set aside, affirm, or modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken; (3) reduce the degree of offense of which the appellant was convicted; (4) reduce the punishment imposed by the trial court; or (5) order a new trial.' " *Id.* (quoting Ill. S. Ct. R. 615(b) (eff. Jan. 1, 1967)).

¶ 55    The court then found that the defendant's constitutional challenge to SORA did not fall within the permissible scope of review afforded to reviewing courts pursuant to that rule.  In doing

so, the court explained that the defendant's obligation to register as a sex offender was not encompassed within the judgment or any order of the trial court; rather, it arose by operation of law and was a collateral consequence of his conviction. *Id.* ¶¶ 17, 19. Therefore, SORA's registration requirement could likewise not be construed as a "proceeding" or as a "punishment imposed by the trial court." *Id.* ¶ 18. As such, the court found that "none of the criteria of Rule 615(b) for invoking the powers of a reviewing court have been satisfied in this case" and concluded that "a reviewing court has no power on direct appeal of a criminal conviction to order that defendant be relieved of the obligation to register as a sex offender when there is neither an obligation to register imposed by the trial court nor an order or conviction that the defendant is appealing that is directly related to the obligation or the failure to register." *Id.* ¶ 18. The court reasoned that "[a] contrary rule would permit appeal of collateral issues on direct appeal from a criminal conviction not only to sex offender obligations but to a host of other collateral consequences that are not imposed by trial courts and are not embodied in their judgments," such as the loss of the right of a felon to vote or possess firearms. *Id.* ¶ 19. Moreover, "[a]llowing defendants to challenge the collateral consequences of a conviction on direct appeal would place a reviewing court in the position of ruling on the validity (or resolving the details) of regulatory programs administered by state agencies and officials that are not parties to the action." *Id.*

¶ 56 Accordingly, because the court determined that a reviewing court has no authority on direct appeal of a criminal conviction to order that a defendant be relieved of his obligation to register as a sex offender under SORA when that obligation was not imposed upon him by the trial court and where the appeal did not directly relate to the defendant's failure to register as a sex offender or failure to abide by any other SORA requirements, it dismissed the defendant's constitutional challenges to SORA. *Id.* ¶ 25. The court, however, suggested that in the future, constitutional

challenges to SORA could be mounted in one of two ways: "(1) through a direct appeal from a case finding a defendant guilty of violating the regulation he attempts to challenge as unconstitutional, such as the sex offender registration law [citation], or (2) by filing a civil suit seeking a declaration of unconstitutionality and relief from the classification as well as the burdens of sex offender registration." *Id.* ¶ 21.

¶ 57 Here, we conclude that defendant's constitutional challenges to SORA are foreclosed by *Bingham*. Like *Bingham*, the instant case is a direct appeal from a criminal conviction in which defendant challenges the constitutionality of SORA. Defendant's obligation to register as a sex offender, however, was not a requirement that was imposed by the trial court or embodied in its judgment; rather it arose by operation of law and was a collateral consequence of his conviction and his status as a sex offender. Because defendant's obligation to register as a sex offender was not imposed upon him by the trial court and because this appeal has no direct relation to his obligation or failure to register as a sex offender, defendant's constitutional challenges to SORA are not properly before this court. *Id.* ¶ 18.

¶ 58 In so finding, we acknowledge that the facts and procedural posture of this case differ slightly from those present in *Bingham* because the sex offense that resulted in the defendant's registration requirement in *Bingham* was not the conviction on appeal before the court; rather, he was contesting the constitutionality of SORA following his conviction for theft. Here, in contrast, defendant is raising a constitutional challenge to SORA on appeal from his conviction for criminal sexual assault. This court, however, has repeatedly found that *Bingham* controls and precludes reviewing courts from addressing a defendant's facial or as applied constitutional challenges to SORA on direct appeal from a sex offense where, as here, the registration requirement is not included in the judgment and where the appeal has no direct relation to the defendant's obligation

or failure to register as a sex offender in compliance with SORA's mandates. Compare *People v. Wells*, 2019 IL App (1st) 163247, ¶ 51 (dismissing the defendant's due process and facial challenges to SORA where the Act's registration requirement was a collateral consequence of his aggravated criminal sexual abuse conviction and his constitutional challenges were thus beyond the permissible scope of appellate review); *People v. Christian*, 2019 IL App (1st) 153155, ¶ 17 (dismissing the defendant's due process and proportionate penalties challenges to SORA that were raised on direct appeal from his aggravated criminal sexual abuse conviction because the sex offender registration requirement was not imposed upon him by the trial court, and as a result, his constitutional challenges exceeded our scope of power to grant relief under Supreme Court Rule 615(b)); *People v. McArthur*, 2019 IL App (1st) 150626-B, ¶ 46 (dismissing the defendant's facial and as applied constitutional challenges to SORA that he raised on direct appeal from his aggravated criminal sexual abuse conviction where the trial court did not impose upon the defendant the obligation to register as a sex offender and where the appeal had no direct relation to his obligation or failure to register); *People v. Denis*, 2019 IL App (1st) 151892, ¶ 97 (finding that we lacked jurisdiction to consider the defendant's constitutional challenges to SORA on direct appeal from his criminal sexual abuse and aggravated criminal sexual assault convictions because his obligation to register as a sex offender was a collateral consequence of his convictions); *with People v. Rodriguez*, 2019 IL App (1st) 151938-B, ¶ 10 (finding that the defendant's constitutional challenge to SORA could be reviewed on appeal because the trial court's judgment contained an "explicit[] *** pronouncement" that the defendant was required to register as a sex offender and defendant was appealing from that judgment); *and People v. Lee*, 2019 IL App (1st) 152522, ¶ 27 (finding that the defendant's constitutional challenges to SORA were properly before the appellate court because he was directly appealing his conviction for violating SORA's registration

requirements). In light of the foregoing precedent, we conclude that we lack jurisdiction to adjudicate defendant's constitutional challenges to SORA and dismiss that portion of his appeal.

¶ 59    CONCLUSION

¶ 60    Judgment of the circuit court is affirmed in part; appeal dismissed in part.

¶ 61    Affirmed in part; appeal dismissed in part.