2021 IL App (1st) 182722-U

FIFTH DIVISION
June 30, 2021

No. 1-18-2722

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 09 CR 08680 |
| | ) | |
| CESAR BECERRA, | ) | |
| | ) | Honorable Allen F. Murphy, |
| Petitioner-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The circuit court did not err in summarily dismissing petitioner's postconviction petition at the first stage.  Affirmed.

¶ 2    Petitioner Cesar Becerra appeals from an order of the circuit court of Cook County summarily dismissing his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)).  Petitioner contends that he raised an arguable claim of ineffective assistance of counsel for failing to (1) cross-examine a witness about the details of a plea agreement that the witness made with the State regarding charges that arose during the pendency of petitioner's trial, (2) use the videotaped statements of the two occurrence witnesses,

and (3) investigate and use videotaped surveillance footage from two locations that petitioner claims would have supported his self-defense claim. We affirm.

¶ 3                              BACKGROUND

¶ 4      This court has detailed the underlying facts of this case in an earlier decision. See *People v. Becerra*, 2017 IL App (1st) 151448-U, *appeal denied*, No. 123126 (March 21, 2018) (Table). We thus limit the facts to those that are pertinent to our discussion of the particular issue on appeal.

¶ 5      Petitioner was charged with eight counts of first-degree murder, two counts of unlawful use of a weapon by a felon, and twelve counts of aggravated unlawful use of a weapon in connection with the shooting of Jose Garza on September 21, 2008. *Id.* ¶ 4. Petitioner was arrested about seven months later in Laredo, Texas. *Id.* Petitioner claimed that he shot Garza in self-defense. *Id.* ¶ 17. Following a bench trial, petitioner was found guilty of first-degree murder and sentenced to 50 years in prison. *Id.* ¶ 2.

¶ 6      The following evidence was adduced at petitioner's trial, which began on August 27, 2014. Jesus Gonzalez testified that, on September 20, 2008, he, Garza (his friend), and petitioner were at Cristobal Tiscareno's house in Harvey, talking and drinking beer. *Id.* ¶ 11. At about 10 p.m., they left Tiscareno's house, drove to Garza's house, and then got into Garza's car. *Id.* They drove to Club 390 in Chicago Heights and remained there drinking for several hours. *Id.* Gonzalez stated that, at Club 390, they "bought a bottle" and had some mixed drinks, as well. Tiscareno testified that, initially, they drank "a couple of rounds" of beer, and later Garza starting "buying bottles" instead of "individual beers" and that "the party spilled over into the next early morning." Tiscareno stated that he had stopped drinking at around 2 a.m., however. Petitioner and Garza began arguing as the four men were about to leave. *Id.*

¶ 7    The men left the club and drove away in Garza's vehicle with Garza driving. *Id.* After Garza hit the median, however, Gonzalez took over driving. Garza was in the front passenger seat while Tiscareno and petitioner were in the back seat. *Id.* Petitioner and Garza continued arguing, and Gonzalez pulled the car over twice to tell them to stop. *Id.*

¶ 8    Gonzalez did not remember what the argument was about but heard a lot of name-calling especially by petitioner. *Id.* ¶ 12. While Gonzalez was trying to park the car near Tiscareno's house, petitioner jumped out of the car and walked down a nearby alley toward petitioner's house. *Id.* Garza and Tiscareno got out of the car to urinate, and when Gonzalez was about to get back into the car, he saw petitioner had returned, walking toward Garza. *Id.* Gonzalez heard petitioner say "now what bitch" to Garza, who was standing on the passenger side of the car with the door open. *Id.* Garza raised both of his hands, and Gonzalez saw petitioner pull out a rifle and shoot Garza in the chest. *Id.* Garza grabbed his chest, hit the back of the door, and fell to the ground. *Id.* Gonzalez then heard another shot. *Id.* Gonzalez ran down the alley after petitioner pointed the gun at him. *Id.* Gonzalez testified that he then heard another gunshot. *Id.* Gonzalez's wife called 9-1-1, and when the police arrived, Gonzalez was brought to Tiscareno's house. *Id.* Gonzalez said that Garza was not armed with a gun or a weapon that evening and that Garza was not the type of person to carry a gun. *Id.*

¶ 9    Tiscareno's testimony was substantially consistent with Gonzalez's. Tiscareno saw petitioner jumping out of the vehicle and walking away. *Id.* ¶ 14. Garza, Tiscareno and Gonzalez exited the vehicle to urinate. *Id.* As Tiscareno began walking toward his home, he heard petitioner say, "Now who's the bitch?" *Id.* Tiscareno turned around and saw petitioner walking toward Garza holding a rifle. *Id.* Tiscareno saw petitioner fire the first shot at Garza's upper chest or face area. *Id.* Tiscareno asked petitioner, "What the f*** are you doing?" *Id.* Petitioner pointed a gun

3

at him, so Tiscareno ran home. *Id.* Tiscareno then saw petitioner approach Garza and heard another gunshot. *Id.* Tiscareno called 9-1-1 and heard another shot while inside his house. *Id.*

¶ 10 Police investigating the crime scene found no weapon on Garza's person or in his immediate vicinity. *Id.* ¶ 15. A medical examiner testified that Garza's cause of death was multiple gunshot wounds. *Id.* Garza's autopsy revealed that he had suffered from several gunshot wounds consistent with shooting "at close range," one of which was inflicted while he was "on the ground and the shooter standing above [him]." *Id.* ¶ 49.

¶ 11 Petitioner testified that, after Garza started drinking while they were at Club 390, Garza became louder, and his demeanor changed. *Id.* ¶ 18. Petitioner told the others that he wanted to leave at about 1 a.m. and again at around 2 a.m., but Garza told him not to be a "p***" or "a little bitch." *Id.* At closing time, Garza tried to talk to one of the strippers and get one more drink, but the stripper did not want to talk to him. *Id.* ¶ 19. Garza got angry when the woman bought a drink for petitioner and Tiscareno. *Id.* Petitioner said that he was afraid of Garza because Garza was an "Inca" and petitioner was in the presence of several Latin Kings members. *Id.*

¶ 12 The four men left the club, got in the car with Garza driving. *Id.* While making a turn, Garza hit the median and scraped the bottom of his car. *Id.* Gonzalez then took over driving, with Garza moving to the front passenger seat, Tiscareno behind the passenger seat, and petitioner behind the driver. *Id.* Petitioner told Garza, "Man, stupid ass shouldn't have been driving drunk." *Id.* According to petitioner, Garza turned around, swore at him, and tried to slap him. *Id.* Petitioner stated that Garza threatened to beat him, which scared petitioner. *Id.*

¶ 13 Gonzalez stopped the car by the Harvey Police station and, when they were all out of the car, petitioner stated that he saw Garza reach under the passenger seat, retrieve a gun, and place it in his waistband. *Id.* ¶ 20. According to petitioner, Garza threatened him. *Id.* Gonzalez told them

4

to get back in the car, that they would "take it to the trailer courts." *Id.* Petitioner stated that he was scared and could not run. *Id.* When they reached the first stop sign by the trailer court, petitioner jumped out of the car, and petitioner heard Garza yell, "Get that m\*\*\*." *Id.*

¶ 14 Petitioner ran to his friend Geronimo's trailer where he had been staying. *Id.* Petitioner retrieved a rifle from under the trailer next to Geronimo's trailer known to him to be hidden there by the Latin Kings. *Id.* Petitioner entered Geronimo's trailer and, while inside he heard dogs barking outside and saw the other three men approaching the trailer and yelling to "get the f\*\*\* out." *Id.* Petitioner stated that he fled the trailer through the back door into a wooded area where he hid for approximately one hour. *Id.*

¶ 15 When petitioner returned to the trailer court, he hid the rifle underneath a vehicle parked in front of his sister's trailer home. *Id.* ¶ 21. He heard a car door open and saw Garza get out of the car. *Id.* Petitioner saw Garza reach for his waist—where petitioner had seen him put a gun earlier that night, so petitioner took out the rifle and shot Garza. *Id.* When petitioner first started shooting, he was 20 feet away from Garza but continued to walk to Garza, who was by the car. *Id.* Petitioner stated that he stopped shooting when he no longer heard Garza threatening to kill him. *Id.* Petitioner agreed that no one shot at him and that he was the only person shooting. *Id.* Petitioner ran into the wooded area and threw the rifle. *Id.* He then fled to Lansing, Illinois, then to Texas and eventually to Mexico. *Id.* Petitioner stated that he eventually turned himself in at the United States/Mexico border because he believed his family was in danger. Petitioner was then taken to the county jail in Webb County, Texas.

¶ 16 Petitioner admitted that he spoke to an investigator and assistant State's Attorney from the Cook County State's Attorney's office after being admonished of his *Miranda* rights. *Id.* Petitioner said that he told them that there was an argument at the night club, and Garza cursed at

him. *Id.* Petitioner added that he saw Garza retrieve a gun and put it in his waistband when they had stopped near the Harvey police station. *Id.* Petitioner denied telling them that he walked up to Garza, who was on the ground, stood over him with a rifle, and fired. *Id.* Petitioner also denied shooting Garza in the face and denied telling them that he did. *Id.*

¶ 17 After the defense rested, Investigator Joseph Thomas testified in rebuttal that he and a Cook County assistant State's Attorney met with petitioner at the Webb County Jail in Laredo, Texas. *Id.* ¶ 23. Thomas testified that, during his conversation with petitioner, petitioner did not tell them that (1) there were arguments at the night club before petitioner got in the car to go home, (2) Garza was mad and cursing at petitioner, (3) petitioner called Garza "a stupid ass" because Garza drove drunk, or (4) Garza retrieved a gun and placed it in his waistband during the car ride home. *Id.* Thomas testified that petitioner admitted that, after shooting Garza the first time and seeing Garza fall to the ground on his back, and petitioner walked up to him, stood over him, pointed the rifle at him, and pulled the trigger again. *Id.* Petitioner also said that he shot Garza in the face, and Garza was face down when petitioner left. *Id.*

¶ 18 The circuit court found petitioner guilty of eight counts of first-degree murder and rejected his self-defense claim. *Id.* ¶ 24. The court merged the counts and sentenced him to 50 years' imprisonment, comprising a 25-year sentence for first degree murder and 25-year add-on for personally discharging a firearm that caused Garza's death. *Id.* On appeal, petitioner contended, *inter alia*, that his trial counsel was ineffective for failing to investigate and present video surveillance from Club 390. *Id.* ¶ 55. We rejected his claim, however, noting that it was based upon pure speculation because "the record does not reflect that any such video surveillance existed." *Id.* ¶ 60 (citing *People v. Redmond*, 341 Ill. App. 3d 498, 516 (2003)). We noted that

6

there was "substantial" evidence supporting petitioner's guilt and affirmed petitioner's conviction and sentence. *Id.* ¶¶ 63, 65.

¶ 19    On September 10, 2018, petitioner filed the present postconviction petition. Petitioner claimed, among other things, ineffective assistance of trial counsel for failure to (1) obtain "video surveillance" from Club 390; (2) obtain video surveillance footage from the area just outside of the Harvey police station and "Sticks Tow Yard"; (3) obtain video surveillance footage of Tiscareno's police interrogation; and (4) question petitioner, Gonzalez, and Tiscareno about their alcohol, cocaine, and marijuana usage prior to the offense  Petitioner also claimed that he was denied the effective assistance of appellate counsel based upon appellate counsel's failure to argue that petitioner's trial counsel was ineffective when he did not impeach Gonzalez with the video recording of his interrogation by police.

¶ 20    Petitioner attached as an exhibit to his petition a photocopy of a "certified statement of conviction / disposition" indicating that Tiscareno had been charged with one count each of manufacture/delivery of between 500g and 2000g of cannabis and possession of the same amount of cannabis on July 13, 2010. The exhibit further shows that, on November 30, 2011, there were entries of a *nolle prosequi* for the first charge, and a guilty plea and sentence of two years' probation on the second charge. Finally, the exhibit shows that the probation was terminated as "satisfactory" on November 27, 2013.

¶ 21    With respect to the various video recordings, petitioner stated that he could not attach a copy of the Club 390 surveillance footage but wrote that a copy of the footage "may be" in either the State's Attorney's office, the Public Defender's office, or with the management of Club 390. With respect to the Harvey Police Department footage, petitioner said he was unable to obtain the video because he is indigent and incarcerated, but the Harvey Police Department footage "may

7

still be secured on a memory in Harvey security surveil[l]ance." Similarly, petitioner stated that the video of Tiscareno's statement to Harvey police is with either the State's Attorney's office or the Public Defender's office.

¶ 22 On November 2, 2018, the circuit court summarily dismissed petitioner's postconviction petition as frivolous and patently without merit. This appeal follows.[1]

¶ 23 ANALYSIS

¶ 24 On appeal, petitioner contends that the circuit court erred in summarily dismissing his postconviction petition at the first stage of proceedings. Petitioner argues that his trial counsel was at least arguably ineffective for failing to (1) cross-examine Tiscareno about the details of his plea agreement that he made with the State regarding cannabis charges that arose during the pendency of petitioner's trial; (2) use the videotaped statements of Tiscareno and Gonzalez, which petitioner claims would have shown that both witnesses were "extremely intoxicated" at the time of the offense, impeaching their credibility; and (3) investigate and use videotaped surveillance footage from Club 390 and the "Harvey Police Department and nearby tow yard," which petitioner claims would have corroborated petitioner's testimony that Garza became aggressive toward him and supported his self-defense claim. The State responds that petitioner's claims are both (1) barred by *res judicata* and forfeiture and also (2) frivolous and patently without merit.

¶ 25 The Act allows a defendant to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). An action for postconviction relief is a collateral proceeding rather than an appeal from the underlying judgment.

---

[1] On September 25, 2020, our supreme court issued a supervisory order directing us to treat the notice of appeal file-stamped December 18, 2018, as a properly perfected appeal from the circuit court's November 2, 2018, order. See *Becerra v. Coghlan*, No. 126534 (Ill. Sept. 25, 2020) (supervisory order).

*People v. Williams*, 186 Ill. 2d 55, 62 (1999). Principles of *res judicata* and waiver will limit the range of issues available to a postconviction petitioner " 'to constitutional matters which have not been, and could not have been, previously adjudicated.' " *People v. Scott*, 194 Ill. 2d 268, 273-74 (2000) (quoting *People v. Winsett*, 153 Ill. 2d 335, 346 (1992)). Accordingly, rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised in the earlier proceedings, but were not, will ordinarily be deemed waived. *Id.* at 274; 725 ILCS 5/122-3 (West 2018).

¶ 26 Once a petitioner files a petition under the Act, the trial court must first, independently and without considering any argument by the State, decide whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). A postconviction petition is frivolous or patently without merit only if it "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009); see 725 ILCS 5/122-2.1(a)(2) (West 2018). A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. A claim completely contradicted by the record is an example of an indisputably meritless legal theory. *Id.* Fanciful factual allegations include those that are fantastic or delusional. *Id.* at 17.

¶ 27 To survive dismissal at this initial stage, the postconviction petition "need only present the gist of a constitutional claim," which is "a low threshold" that requires the petition to contain only a limited amount of detail. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). Moreover, a petition need not make legal arguments or cite to legal authority. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). In addition, all well-pleaded facts must be taken as true unless "positively rebutted" by the trial record. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). However, "while a *pro se* petition is not expected to set forth a complete and detailed factual recitation, it must set forth some facts

which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent." *Delton*, 227 Ill. 2d at 254-55. In considering the petition, the trial court may examine the court file of the criminal proceeding, any transcripts of the proceeding, and any action by the appellate court. 725 ILCS 5/122-2.1(c) (West 2018). In addition, a postconviction petition may be dismissed at the first stage of proceedings as frivolous and patently without merit when the claims raised therein are barred by *res judicata* or forfeiture. *People v. Blair*, 215 Ill. 2d 427, 442 (2005). We review the trial court's summary dismissal of a postconviction petition *de novo*. *People v. Simms*, 192 Ill. 2d 348, 360 (2000). Finally, while the trial court's reasoning may aid this court, we only review the judgment, not the reasoning, of the trial court. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 28    This issue presented to this court concerns a claim of ineffective assistance of counsel. Those claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish ineffective assistance, a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 496-97; *Strickland*, 466 U.S. at 690, 694. Notably, however, mere conjecture and speculation do not establish a reasonable probability under the second prong of the *Strickland* test. *People v. Gosier*, 165 Ill.2d 16, 24 (1995). Instead, a reasonable probability is a probability that is "sufficient to undermine confidence in the outcome." *People v. Houston*, 226 Ill. 2d 135, 149 (2007). The failure to establish either prong

of the *Strickland* test is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 29                                   The Cross-Examination of Tiscareno

¶ 30    Petitioner first argues that he made an arguable claim of ineffective assistance of counsel based upon trial counsel's failure to cross-examine Tiscareno regarding Tiscareno's plea of guilty to a lesser offense of cannabis possession, which resulted in a two-year term of probation. Petitioner argues that Tiscareno's guilty plea and subsequent "lenient" sentence—as well as the fact that he "faced a violation of his probation"—indicated that Tiscareno had an incentive to testify favorably for the State. According to petitioner, had counsel thoroughly interrogated Tiscareno on this point, he would have exposed Tiscareno's potential bias.

¶ 31    In this case, according to the exhibit attached to petitioner's postconviction petition, Tiscareno's sentence of probation was terminated as "satisfactory" on November 27, 2013, which was nearly one year *before* the start of petitioner's August 27, 2014, trial. As the State points out, Tiscareno had nothing to lose and thus no incentive to testify favorably for the State. Petitioner cites noting in the record (nor do we find anything) that would suggest that Tiscareno's guilty plea required testimony favorable to the State in an unrelated case, nor does petitioner provide anything to indicate that the State could somehow revive the nol-prossed count or add a new charge if his testimony did not favor the State. "Defense counsel is not ineffective for failing to make a fruitless argument." *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 133 (citing *People v. Edwards*, 195 Ill. 2d 142, 165 (2001)). Therefore, petitioner's claim does not meet the first prong of *Strickland* and fails on this basis alone. See *Clendenin*, 238 Ill. 2d at 317-18.

¶ 32    Moreover, even assuming, *arguendo*, that trial counsel's performance was objectively unreasonable, petitioner's claim fails the prejudice prong. Although petitioner maintains he shot

and killed Garza in self-defense, we held on direct appeal that there was "substantial" evidence supporting petitioner's first-degree murder conviction. Both Tiscareno and Gonzalez testified that Garza was unarmed, and investigating officers found no weapon on or near Garza's body. Garza's autopsy revealed that he died as a result of multiple gunshot wounds at close range, including one that the shooter (*i.e.*, petitioner) inflicted while standing directly over Garza while he lay on the ground. Finally, petitioner testified at trial that, although he claimed self-defense, he nonetheless first started shooting at Garza when he was 20 feet away from Garza but then *continued to walk toward Garza* and only stopped shooting when he no longer heard Garza threatening to kill him. *Becerra*, 2017 IL App (1st) 151448-U, ¶ 21. On these facts, we cannot hold that it is arguable that there is as reasonable probability that the result of petitioner's trial would have been different had trial counsel cross-examined Tiscareno regarding Tiscareno's guilty plea. The circuit court thus did not err in summarily dismissing this claim at the first stage. See *Hodges*, 234 Ill. 2d at 16.

¶ 33                    The Videotaped Statements of Tiscareno and Gonzalez

¶ 34    Petitioner next contends that he made an arguable claim of ineffective assistance of counsel based upon trial counsel's failure to present the video recorded statements of Tiscareno and Gonzalez at the Harvey police department. Petitioner claims that the recordings would have shown that the two witnesses were still intoxicated at the time of their statements, which would have impeached their credibility and ability to accurately recall the events of the evening. The State responds that petitioner's claim regarding Gonzalez's video statement involved a claim of ineffective assistance of *appellate* counsel and is thus forfeited. Forfeiture aside, however, petitioner's claim is without merit.

¶ 35    In this case, trial counsel did elicit from both Tiscareno and Gonzalez that they had been drinking alcohol for several hours before petitioner shot and killed Garza. The testimony of

Gonzalez and Tiscareno revealed that, before going to Club 390, they drank beer at Tiscareno's house, and then at Club 390, both of them continued drinking beer and mixed drinks after Garza bought a bottle for the group. The drinking continued in the early morning hours. Therefore, even if the recorded statements truly showed Tiscareno and Gonzalez inebriated, that would have been merely cumulative to what had already been presented to the fact finder (here, the circuit court). It has long been held that defense counsel is not ineffective for failing to provide cumulative evidence. See *People v. Enis*, 194 Ill. 2d 361, 412 (2000) (citing *People v. Henderson*, 171 Ill. 2d 124, 155 (1996)). In addition, it is equally well established that an allegation that counsel failed to present cumulative evidence also fails the prejudice prong of *Strickland*. See, *e.g.*, *People v. Pulliam*, 206 Ill. 2d 218, 239 (2002); *People v. Johnson*, 262 Ill. App. 3d 781, 791 (1994); *People v. Jarnagan*, 154 Ill. App. 3d 187, 194 (1987). This claim is therefore meritless.

¶ 36                          The Videotaped Surveillance Footage

¶ 37    Finally, petitioner contends that trial counsel was arguably ineffective for failing to investigate and present surveillance video from both Club 390 as well as the Harvey police department and the nearby tow yard. Petitioner claims this evidence would have supported his self-defense claim because they would have confirmed that Garza became aggressive toward petitioner at Club 390 and that Garza retrieved a gun when they stopped near the police station.

¶ 38    With respect to the purported video recordings at Club 390, we note that this precise claim was raised—and rejected—on direct appeal. See *Becerra*, 2017 IL App (1st) 151448-U, ¶ 60. We noted that the record did not "reflect that any such video surveillance existed," and thus rejected petitioner's claim because it was based upon "pure speculation." *Id.* (citing *People v. Redmond*, 341 Ill. App. 3d 498, 516 (2003)). As noted above, rulings on issues that were previously raised on direct appeal are *res judicata*. *Scott*, 194 Ill. 2d at 274. The circuit court therefore did not err

in summarily dismissing this claim. Moreover, in his brief before this court, petitioner states that it is "quite" probable and "almost" a certainty that Club 390 had video surveillance. Petitioner does not provide anything beyond speculation that the equipment was operable or what it would show. Since there is no evidence in the record or attached to the petition that establishes the content of the video recording, petitioner's claim is without merit.

¶ 39    A similar fate befalls petitioner's claim regarding the cameras at the Harvey police department and nearby tow yard. In his petition, petitioner stated that those cameras "*may have recorded the incident*" showing Garza brandish a gun at petitioner. Where petitioner cannot show what the contents of the video recordings would be (or whether they exist), petitioner cannot meet the first prong of the *Strickland* test. See *Redmond*, 341 Ill. App. 3d at 516.

¶ 40    In addition, even if these materials had been produced, we cannot hold that it is arguable that petitioner suffered prejudice. Speculation as to what precisely the video recordings would show falls "far short" of the prejudice prong of *Strickland*. See *People v. Olinger*, 176 Ill. 2d 326, 363 (1997). Furthermore, as noted above, there was substantial evidence establishing petitioner's guilt for the first-degree murder of Garza. Both Tiscareno and Gonzalez saw petitioner walk up to Garza and shoot him once with a rifle. Petitioner testified that he kept walking toward Garza after the first shot and continued shooting Garza until Garza stopped allegedly threatening him. Garza's autopsy confirmed that he died as a result of multiple close-range gunshot wounds, including one that was inflicted while Garza was lying on the ground and petitioner stood over him. Finally, we note that no weapon was found on Garza or anywhere in the nearby vicinity. Since petitioner cannot meet both prongs of the *Strickland* test, his claim on this point necessarily fails. The court therefore properly dismissed this claim at the first stage of proceedings.

¶ 41                                CONCLUSION

¶ 42    The circuit court did not err in summarily dismissing petitioner's postconviction petition

at the first stage.  Accordingly, we affirm the judgment of the circuit court.

¶ 43    Affirmed.